Cynthia L. Martin, Judge
Kedric R. Kendrick ("Kendrick") appeals from the trial court's judgment convicting him of one count of unlawful use of a weapon. Kendrick asserts that the trial court committed plain error in failing to instruct the jury sua sponte on his right of self-defense. Kendrick asserts that there was substantial evidence to support each of the prerequisites for self-defense so that he was entitled to a self-defense instruction even though he did not request one. We affirm.
Factual and Procedural History
This case revolves around an altercation between Kendrick and Steven Williams ("Williams") on March 29, 2014, inside Kendrick's residence in Jefferson City, Missouri. The State charged Kendrick with one count of unlawful use of a weapon in violation of section 571.030.1(4).[1] The information alleged that Kendrick "knowingly exhibited, in the presence of one or more persons a .45 Caliber pistol, a weapon readily capable of lethal use, in an angry or threatening manner." At trial, the State and Kendrick provided differing versions of what happened on March 29, 2014. We set forth both versions because the issue to be decided in this appeal requires that we consider the evidence in the light most favorable to the defense. State v. Bruner , No. SC95877, 541 S.W.3d 529, 533-34, 2018 WL 414948, at *4 (Mo. banc Jan. 16, 2018).
The Version Presented by the State
Williams testified that he and his wife traveled from their home in Grandview, Missouri to Jefferson City on March 29, 2014, to help his daughter move to Kansas City. Williams testified that he arrived in Jefferson City between 3:00 p.m. and 4:00 p.m. and met his daughter in a parking lot. Williams then followed his daughter to the residence she shared with Kendrick at 212 Dunford Street. Upon their arrival at the residence, Williams's daughter knocked on the door, and Kendrick let her in the *119 house. Williams's daughter motioned for Williams to follow her into the residence. Williams's daughter went to the back of the residence, where the washer and dryer were located, to pack her clothes. Williams helped his daughter pack her belongings, taking them out of the house and loading them into a moving truck.
Williams testified that, after approximately ten minutes, he saw Kendrick grab his daughter around her neck. Williams stopped what he was doing and said, "Let her go." Williams testified that, after his daughter and Kendrick struggled for a few minutes, Kendrick let her go, and she ran out of the house. Williams was in the residence's living room with his grandchildren when Kendrick approached Williams with a handgun. Kendrick had the handgun pointed toward Williams. Williams yelled at his wife, who was outside, to "[g]et the kids" and "[c]all 911." Williams testified that Kendrick pointed the handgun at him for approximately three to four minutes. During that time, Williams said, "Do you want to put yourself in a man's position? Do you want to put yourself in this position?" Williams testified that Kendrick did not respond and kept pointing the handgun toward him.
Williams testified that Kendrick lowered the handgun as a police officer approached the residence's front door. Williams testified that, at that point, Kendrick unloaded the handgun and set it down in the kitchen. Williams testified that, after Kendrick put the handgun down, and while the officer was in the residence, Williams pushed Kendrick, and the two had a physical altercation. Williams testified that a police officer separated the two men, after which Williams went outside.
Officer Joshua Hagemeyer ("Officer Hagemeyer"), the police officer who responded to the disturbance between Kendrick and Williams, testified that he responded to a call at 212 Dunford Street. Officer Hagemeyer testified that, as he approached the residence, he looked through the front door and saw Kendrick pointing a handgun at Williams while the two men were in the kitchen. At that point, Officer Hagemeyer unholstered his gun, pointed it in Kendrick's direction, and ordered Kendrick to drop the handgun. After Officer Hagemeyer yelled the command several times, Kendrick placed the handgun on the kitchen counter. Officer Hagemeyer testified that Williams took a couple steps back, and Kendrick picked up the handgun again. Officer Hagemeyer repeated the command to drop the handgun. Kendrick removed the magazine, racked the slide on the handgun to remove the round from the chamber, and then placed it back on the counter.
Officer Hagemeyer testified that, after Kendrick set the handgun down a second time, Williams grabbed Kendrick, pulling him away from the kitchen and into the living room. Officer Hagemeyer used his radio to call for assistance from a backup officer. Officer Hagemeyer holstered his gun and separated the two men. Officer Hagemeyer asked Kendrick what happened, but Kendrick did not respond and instead walked to the back room in the house. Officer Hagemeyer testified that he then grabbed Kendrick's arms and forced him facedown onto a mattress until a second officer could assist in handcuffing Kendrick. Officer Hagemeyer escorted Kendrick out of the residence and into the rear seat of a patrol vehicle before transporting him to the Cole County Jail.
Officer Hagemeyer testified that, later that evening, he interviewed Kendrick at the Cole County Jail. Officer Hagemeyer testified that Kendrick told Officer Hagemeyer that "Williams had come in and immediately started aggressively moving towards him in a threatening manner."
*120 Kendrick told Officer Hagemeyer that it was at this point that he retrieved his handgun. Later in the interview, Kendrick told Officer Hagemeyer that he "might not be telling ... the whole truth."
The Version Presented by Kendrick
Kendrick testified in his own defense, providing his account of the events that took place on March 29, 2014. Kendrick testified that, initially, Williams did not say anything threatening or act in any way that was threatening. Kendrick testified that the altercation between the two began when Williams pushed Kendrick two times and raised his voice. Kendrick testified that he told Williams to leave, but Williams pushed Kendrick a third time. At that point, Kendrick went to his bedroom to grab a handgun from the closet. According to Kendrick, Williams was standing in the doorway to the bedroom at that time. Kendrick testified that, while in the bedroom, he removed the handgun's magazine because he was not planning to use it. Kendrick testified that he had the handgun by his side the entire time and that he never pointed it toward Williams.
Kendrick testified that he then saw a police officer outside the house. At that point, Kendrick placed the handgun on the kitchen counter. Kendrick testified that, as the officer approached the house, Kendrick walked toward the front door to meet the officer. Williams was walking behind Kendrick and shoving him. Kendrick testified that the officer ordered both men to walk back into the kitchen. Williams then grabbed Kendrick from behind and tried to force him into submission. In particular, Williams tried to choke Kendrick from behind. Kendrick testified that he walked toward his room to retrieve his shoes and cell phone, but Officer Hagemeyer forced him to the bed and placed him in handcuffs. Kendrick testified that Officer Hagemeyer later took him to the Cole County Jail.
Instructions and Closing Arguments
The trial court instructed the jury to find Kendrick guilty of unlawful use of a weapon if it found beyond a reasonable doubt that (1) Kendrick "exhibited in the presence of one or more persons a .45 caliber pistol"; (2) Kendrick "did so in an angry or threatening manner"; (3) "the .45 caliber pistol was readily capable of lethal use"; and (4) Kendrick "acted knowingly with respect to the facts and conduct submitted in this instruction." The trial court did not instruct the jury as to self-defense.
During closing arguments, Kendrick argued that the jury should find him not guilty because the handgun was not capable of lethal use in that the magazine was removed from the gun when Kendrick retrieved it from the closet, and because Kendrick never pointed or exhibited the gun in an angry or threatening manner. Kendrick's attorney did not argue, or refer to, self-defense.
The jury found Kendrick guilty of unlawful use of a weapon, and the trial court sentenced Kendrick to four years imprisonment pursuant to section 559.115.
Kendrick appeals.
Standard of Review
Rule 28.03 provides that "[n]o party may assign as error the ... failure to give instructions or verdict forms unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Nonetheless, our Supreme Court has allowed for plain error review for unpreserved instructional error. See, e.g. , State v. Hunt , 451 S.W.3d 251, 260 (Mo. banc 2014).
Rule 30.20 provides that, whether the alleged errors are briefed or not, plain *121 errors affecting substantial rights may be considered in the discretion of the court when the error has resulted in manifest injustice or miscarriage of justice. In applying plain error review, this Court frequently uses a two-step inquiry. First, the Court must determine whether the claimed error is, in fact, "plain error affecting substantial rights." Rule 30.20. Substantial rights are involved if, facially, there are significant grounds for believing that the error is of the type from which manifest injustice or miscarriage of justice could result if left uncorrected. Id. An error is plain if it is "evident, obvious, and clear." State v. Baumruk, 280 S.W.3d 600, 607 (Mo. banc 2009). In the realm of instructional error, plain error exists when it is clear that the trial court has so misdirected or failed to instruct the jury that manifest injustice or miscarriage of justice has resulted. State v. Ousley, 419 S.W.3d 65, 75 (Mo. banc 2013). Instructional error is plain error when it is apparent the error affected the verdict. State v. Miller, 372 S.W.3d 455, 470 (Mo. banc 2012). Second, if plain error affecting substantial rights is found, the Court determines whether the error actually did result in manifest injustice or a miscarriage of justice. Baumruk, 280 S.W.3d at 607-08.
Id.
At issue in this case is whether the trial court committed plain error in failing to instruct the jury as to Kendrick's right to self-defense even though Kendrick did not request the instruction. " 'The [trial] court must submit a self-defense instruction when substantial evidence is adduced to support it, even when that evidence is inconsistent with the defendant's testimony.' " Bruner , 541 S.W.3d at 534 2018 WL 414948, at *4 (quoting State v. Westfall , 75 S.W.3d 278, 281 (Mo. banc 2002) ). " 'In determining whether the [trial] court erred in refusing to submit an instruction on self-defense, the evidence is viewed in the light most favorable to the defendant.' " Id. (quoting State v. Smith , 456 S.W.3d 849, 852 (Mo. banc 2015) ).
Analysis
Kendrick sets forth a single point on appeal. He argues that the trial court committed plain error in failing to instruct the jury sua sponte on Kendrick's right to self-defense.[2] Kendrick acknowledges that he did not request the trial court to instruct the jury as to his right to self-defense.[3] Nonetheless, Kendrick asserts that the trial court committed plain error in failing to give a self-defense instruction even though Kendrick did not request that the instruction be given because there was substantial evidence to support each of the prerequisites to be entitled to assert self-defense. Kendrick asserts that the failure to submit *122 a self-defense instruction constituted plain error from which a manifest injustice or miscarriage of justice resulted.
The State asserts that, while there are Missouri cases that hold a trial court has a duty to instruct on self-defense whether requested or not, the statute authorizing the trial court to instruct on self-defense has been amended so as to remove the requirement that the instruction be given whether requested by the defendant or not. To support its argument, the State cites to State v. Isbell , 524 S.W.3d 90 (Mo. App. E.D. 2017).
In Isbell , the Eastern District denied a point on appeal that argued the trial court plainly erred in failing to submit an instruction for self-defense sua sponte because substantial evidence did not support the instruction. Id. at 94. Because the Eastern District concluded that there was not substantial evidence to support a self-defense instruction, it also concluded that it did not need to "decide if the trial court was required to sua sponte submit a self-defense instruction, per se as a matter of law." Id. at 93. The Eastern District then noted:
We express reservations regarding Defendant's claim, because the subsequent statutory history appears to have abrogated this duty. The former statutes, upon which this duty was premised, mandated the trial courts to instruct upon all questions of law arising in the case, "whether requested or not." See Section 5231 (1909), Section 4025 (1919), Section 3681 (1929), Section 4070 (1939), Section 546.070 (1949), 546.070 (1978). This directive was removed by the Missouri Legislature in 1984. See Section 546.070 (1986), Section 546.070, RSMo Cum. Sup. 2015. Missouri Supreme Court Rules have also eliminate similar mandates. Compare Rule 26.02(6) (1966) with Rules 27.02 (2016) and 28.02 (2016).
Id. at 93 n.4. Like the Eastern District in Isbell , we need not determine whether the trial court was required to submit a self-defense instruction sua sponte , as there was not substantial evidence to support a self-defense instruction.
Section 563.031.5 places the burden of injecting the issue of self-defense onto the defendant. Thus, " '[s]elf-defense is a special negative defense pursuant to which the defendant has the burden of injecting into the evidence the issue of self-defense while the State continues to have the burden to prove beyond a reasonable doubt that the defendant did not act in self-defense.' " Isbell , 524 S.W.3d at 93 (quoting Jones v. State , 495 S.W.3d 789, 791 (Mo. App. E.D. 2016) ). The quantum of proof required to inject the issue of self-defense has been described by our Supreme Court as "substantial evidence." Bruner , 541 S.W.3d at 535, 2018 WL 414948, at *5. "Sufficient 'substantial' evidence is provided if there is 'evidence putting a matter in issue.' " Id. (quoting State v. Avery , 120 S.W.3d 196, 200 (Mo. banc 2003) ). " 'If the evidence tends to establish the defendant's theory, or supports differing conclusions, the defendant is entitled to an instruction on it.' " Id. (quoting State v. Westfall , 75 S.W.3d 278, 280 (Mo. banc 2002) ). Further, " 'substantial evidence of self-defense requiring instruction may come from the defendant's testimony alone as long as the testimony contains some evidence tending to show that he acted in self-defense.' " Id. (quoting Westfall , 75 S.W.3d at 280 ). Whether the evidence presented at trial injected the issue of self-defense is a question of law. Isbell , 524 S.W.3d at 93.
The right of self-defense allows "the use of physical force to defend oneself against an imminent and unlawful attack." Id. The right of self-defense is codified in section *123 563.031.[4] At the time of Kendrick's crime, section 563.031 provided, in relevant part:
1. A person may, subject to the provisions of subsection 2 of this section, use physical force upon another person when and to the extent he or she reasonably believes such force to be necessary to defend himself or herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful force by such other person, unless:
(1) The actor was the initial aggressor; ...
....
2. A person may not use deadly force upon another person under the circumstances specified in subsection 1 of this section unless:
(1) He or she reasonably believes that such deadly force is necessary to protect himself, or herself or her unborn child, or another against death, serious physical injury, or any forcible felony;
(2) Such force is used against a person who unlawfully enters, remains after unlawfully entering, or attempts to unlawfully enter a dwelling, residence, or vehicle lawfully occupied by such person; or
(3) Such force is used against a person who unlawfully enters, remains after unlawfully entering, or attempts to unlawfully enter private property that is owned or leased by an individual claiming a justification of using protective force under this section.
3. A person does not have a duty to retreat from a dwelling, residence, or vehicle where the person is not unlawfully entering or unlawfully remaining. A person does not have a duty to retreat from private property that is owned or leased by such individual.
(Emphasis added.)
Kendrick was accused of "knowingly exhibit[ing], in the presence of one or more persons a .45 Caliber pistol, a weapon readily capable of lethal use, in an angry or threatening manner." "The Missouri Supreme Court has held that unlawful use of a weapon by exhibiting it in an angry or threatening manner constitutes 'deadly force' for the purpose of ... justification defenses." State v. Cummings , 514 S.W.3d 110, 116 n.8 (Mo. App. W.D. 2017) (citing State v. Parkhurst , 845 S.W.2d 31, 36 (Mo. banc 1992) ). Thus, the three statutory elements that must have been established by substantial evidence in order for Kendrick to inject the issue of self-defense in this case are: (1) that Kendrick was not the initial aggressor, and reasonably believed physical force was necessary to defend himself from what he reasonably believed to be the use or imminent use of unlawful force of another (section 563.031.1); (2) that Kendrick reasonably believed deadly force-that is " 'physical force which is used with the purpose of causing or which a person knows to create a substantial risk of causing death or serious physical injury' "-was *124 necessary to protect himself against death, serious physical injury, or any forcible felony[5] (section 563.031.2(1) ), or was necessary to use against a person who had unlawfully entered, attempted entry, or remained after unlawful entry into his residence (section 563.031.2(2), (3) ); and (3) that Kendrick did not have a duty to retreat (section 563.031.3). Bruner , 541 S.W.3d at 536, 2018 WL 414948, at *6 (quoting Smith , 456 S.W.3d at 852 ). A reasonable belief exists when the defendant has " 'grounds that could lead a reasonable person in the same situation to the same belief.' " Id. (quoting Smith , 456 S.W.3d at 852 ).
Here, assuming arguendo that substantial evidence viewed in the light most favorable to Kendrick supported the elements set forth in section 563.031.1 and .3, the same cannot be said with respect to the deadly force element set forth in section 563.031.2. The evidence, viewed in the light most favorable to Kendrick, established that Williams was unarmed, raised his voice, and pushed Kendrick three times before Kendrick retrieved a handgun. Thus, Kendrick " 'introduced a deadly instrument into what had been, at most, a simple battery and significantly raised the level of violence.' " Bruner , 541 S.W.3d at 537, 2018 WL 414948, at *7 (quoting Dorsey v. State , 113 S.W.3d 311, 317 (Mo. App. S.D. 2003) ). " '[D]eadly force cannot be used to repel a simple assault and battery.' " Id. at 538, 2018 WL 414948, *8 (quoting Dorsey , 113 S.W.3d at 316 ). Instead, "[d]eadly force is only justifiable when the defendant reasonably believes that such deadly force is necessary to protect himself from death, serious physical injury, or any forcible felony." Id. Here, the evidence established, at most, that Williams committed a simple assault and battery against Kendrick. There was no evidence that Kendrick reasonably believed deadly force was necessary to protect himself against death, serious physical injury, or any forcible felony.[6] Section 563.031.2(1).
Nor is there substantial evidence to support the injection of deadly force self-defense pursuant to section 563.031.2(2) or (3). Though Kendrick testified he asked Williams to leave before he retrieved his weapon, there was no evidence that Williams unlawfully entered the residence, that he remained in the residence after unlawfully entering, or that he attempted to unlawfully enter the residence, as required to justify the use of deadly force pursuant to section 563.031.2(2) or (3). To the contrary, the evidence established that Williams's entry to the residence was lawful because Williams's daughter, who shared the residence with Kendrick, gave Williams permission to enter the residence.
*125 Because there was not substantial evidence to support a deadly force self-defense instruction, the trial court did not commit plain error in failing to instruct the jury sua sponte on Kendrick's right to self-defense. Kendrick's point on appeal is denied.
Conclusion
We affirm the trial court's judgment.
All concur

All statutory citations are to RSMo 2000 as supplemented through March 29, 2014, the date the crime was committed, unless otherwise indicated.

Kendrick's point relied on asserts that a self-defense instruction patterned after MAI-CR 3d 306.06 should have been given to the jury. The State responds that, even if Kendrick is entitled to a self-defense instruction, MAI-CR 3d 306.06 is not the correct instruction so that Kendrick's point relied on is facially meritless. The Notes on Use to MAI-CR 3d 306.06A state that the instruction is a revision of MAI-CR 3d 306.06 and that it "should be used for offenses committed on or after August 28, 2007." In his reply brief, Kendrick acknowledges his error and asks that we use our discretion to review Kendrick's claim of plain error because there is no substantive difference between the two instructions that would alter whether or not he was entitled to a self-defense instruction. We have elected to do so.

Whether Kendrick chose not to request a self-defense instruction as a matter of trial strategy or whether Kendrick mistakenly failed to request a self-defense instruction is not a matter before us.

Kendrick cites to the four-part test for self-defense outlined in State v. Whipple , 501 S.W.3d 507, 517 (Mo. App. E.D. 2016), to argue that there was substantial evidence of self-defense presented at trial so as to inject the issue. In Bruner , our Supreme Court dismissed this four-part test as no longer instructive:
While the parties are correct that these are the elements of self-defense under common law, and while they largely, but not completely parallel the elements of self-defense under the statute, it is the statute that necessarily must govern what is required to inject self-defense. Reliance on cases addressing what is required under a different test, therefore, is not helpful, and should no longer be followed.
541 S.W.3d at 537, 2018 WL 414948, at *6. As such, we follow Bruner and use the statutory framework to analyze whether substantial evidence of self-defense was presented at trial.

A forcible felony is statutorily defined as "any felony involving the use or threat of physical force or violence against any individual, including but not limited to murder, robbery, burglary, arson, kidnapping, assault, and any forcible sexual offense." Section 563.011(3).

We recognize that Kendrick's evidence, viewed most favorably to him, was that the magazine was removed from the handgun. This evidence was offered to negate an essential element of unlawful use of a weapon-the crime with which Kendrick was charged-and specifically, the element requiring that the pistol was "readily capable of lethal use." Kendrick's evidence about removing the magazine does not support submission of a self-defense instruction to the charge of unlawful use of a weapon, however. Retrieval of an unloaded handgun is not "justification" for commission of an offense that presumes a handgun capable of lethal use. Stated another way, the evidence that the magazine was removed was only relevant to negate an essential element of the crime charged, and not to justify commission of the crime charged.