

# In the
# Missouri Court of Appeals
# Western District

**CHRISTOPHER SANDERS,**

                    **Appellant,**

**v.**

**STATE OF MISSOURI,**

                    **Respondent.**

**WD84478**

**OPINION FILED:**

**June 14, 2022**

**Appeal from the Circuit Court of Jackson County, Missouri
The Honorable Kenneth R. Garrett, III, Judge**

**Before Division Two:
Karen King Mitchell, P.J., Edward R. Ardini, Jr. and Thomas N. Chapman, JJ.**

Christopher Sanders ("Sanders") appeals a judgment of the Circuit Court of Jackson

County, which denied his Rule 29.15 motion for postconviction relief after an evidentiary

hearing.  Sanders raises three points on appeal alleging that the motion court clearly erred in

denying relief on three claims of ineffective assistance of trial counsel.  Specifically, Sanders

argues that he received ineffective assistance when his trial counsel (1) failed to request a "castle

doctrine" instruction based on section 563.031.2(2);[1] (2) failed to request a self-defense

---

[1] Unless otherwise indicated, statutory references are to RSMo 2000, as updated through the 2010 cumulative supplement.

instruction that removed the duty to retreat based on section 563.031.3; and (3) failed to request a "correct" lesser-included offense instruction. The judgment is affirmed.

## Background

On December 7, 2011, a maintenance worker discovered the body of Sherilyn Hill ("Hill") under the stairwell of a motel in Kansas City, Missouri. A blood-tinged towel was wrapped around the lower part of Hill's face and tied in a knot at the back of Hill's head. A blood-tinged bed sheet was wrapped around Hill's neck and tied in a knot at the back of her neck. A medical examiner determined the cause of death to be blunt force trauma to the head and strangulation. A ligature mark on Hill's neck was determined to be caused by strangulation with a sheet while Hill was alive. The strangulation caused a fracture of Hill's thyroid cartilage and a hemorrhage between her esophagus and trachea. Hill's blunt force trauma injuries included an abrasion on the left side of her forehead; an abrasion on the end of her nose; a contusion on her upper lip; an abrasion next to her left eyebrow; another abrasion and hematoma beside her left eye; a 3/4 inch laceration below her left eye; a contusion on her left cheek; an abrasion in front of her left ear; another abrasion on her left jawline; a 5/8 inch tear on her upper lip; tears in her upper and lower frenulum; a 1 1/2 inch laceration on her lower lip; a seven inch abrasion on her upper left thigh; an abrasion and contusion on top of her left foot; abrasions on the inside and outside of her right knee; an abrasion on the left side of her chest; and four abrasions on the left side of her abdomen. An internal examination revealed that Hill had multiple areas of hemorrhage on her scalp, and her scalp had torn away from her skull.

An investigation revealed that on November 22, 2011, Sanders rented a room at the motel and shared it with Hill and Zonia Brown ("Brown"). Brown told police that Sanders and Hill had been involved in a violent incident at the motel. Sanders was arrested and questioned.

2

Sanders denied that any altercation had occurred. A search of Sanders's home revealed Hill's blood on his boots. Sanders was charged with murder in the second degree for knowingly causing Hill's death "by kicking her and strangulating her."

At trial, Brown testified that she was attempting to find work as a prostitute on November 22, 2011. Brown met Hill, Sanders, and a drug dealer named Monty[2] in a parking lot where she was invited to go to a motel room with them. Sanders and Hill went into the lobby of the motel to get a room. Once inside the motel room, Monty sold crack cocaine to Sanders. Brown testified that she was in the room hoping to smoke crack cocaine, and that Sanders gave Brown a "hit" of crack cocaine. Brown testified that Sanders was smoking the majority of the crack cocaine and that he was using the pipe of Hill or Brown to do so. Brown testified that Hill became dissatisfied with how Sanders was "being stingy with the crack" and at some point Hill pulled a knife on Sanders. Brown testified that Hill stood a couple of feet away from Sanders as she held the knife and demanded that Sanders give Hill more crack cocaine. Brown testified that Hill did not come close to Sanders with the knife but stood and pointed it at him. Hill and Sanders argued with each other until Hill eventually put the knife back in her pocket when Sanders provided Hill and Brown a "little-bitty" piece of crack cocaine. Sanders again started smoking crack cocaine. Brown testified that Hill again requested more crack cocaine. When Sanders refused, Hill again pulled out a knife, pointed it at Sanders, and demanded more crack cocaine. Brown testified that Sanders refused her demand and told Hill to put the knife away, which Hill did. Hill then pulled her knife out a third time, and demanded that Sanders give her

---

[2] Monty was never identified at trial beyond his first name. The trial transcripts at times referred to Monty as "Montay" with an indicator that "Montay" was a phonetic spelling. We refer to this individual as Monty in this opinion.

more crack cocaine. Eventually, Hill returned to an area of the room with a mirror, placed her knife on the sink and started attempting to hit her pipe again with her back facing the rest of the room. Sanders stood by the bed where Brown was sitting. Brown testified that Sanders then looked at Brown and said, "You ready?" Brown understood this to mean that Sanders was going to give Brown more crack cocaine. Instead, Brown testified that Sanders walked behind Hill and kicked Hill in the head. Hill fell against the wall, then tried to get up but was unable to do so, as Sanders kicked her again in the head and continued kicking her. Brown testified that Sanders "just kicked her a thousand times. He kicked her over ten times." Brown testified that she pleaded with Sanders not to kick Hill anymore, but Sanders told Brown: "Shut up, I ain't going to hurt you. She shouldn't have pulled that knife on me." Brown testified that, as Sanders kicked Hill, Hill was "fighting for her life" and that Sanders continued to kick Hill every time Hill tried to get up from the floor. Brown testified that Hill eventually could no longer attempt to get up and laid on the floor after taking what seemed to Brown to be Hill's last breath. Brown testified that Sanders then made Brown get off of the bed, and that Sanders then appeared to begin to wrap Hill in a bed sheet. Brown then ran out of the room.

Sanders testified to a significantly different account of events. Sanders testified that he was riding the bus home from work when he got off near Independence Avenue to get a beer. He eventually entered a convenience store to get another beer when he met Hill, who was standing behind him in line. Hill commented that it looked like Sanders was "getting ready to have a good time." Eventually, the two decided to get a room to "go fool around." Sanders testified that he understood Hill to be a prostitute and that it was his intention to hire her as a prostitute that night. Sanders testified that he and Hill "went to go party." Eventually, Hill and Sanders encountered a man named Monty, whom Sanders understood to be Hill's "pimp" or "overseer."

4

Sanders testified that Monty was going to "hang out" with Hill and Sanders for a while to "make sure everything was cool." Sanders, Monty, and Hill then encountered Brown. Sanders testified that Brown "pretty much invited herself to come along." The group eventually decided to get a room at a motel where Monty was staying. Sanders paid for the room. Then, Sanders, Hill, Brown, Monty, and another unidentified man went up to the room Sanders rented. Sanders testified that he purchased crack cocaine for Hill and Brown from Monty. After approximately 30 minutes, Monty and the other man left the room. Sanders testified that he gave the crack cocaine to Hill and Brown, but that Sanders also smoked some of the crack cocaine, borrowing a pipe from Hill or Brown to do so.

At some point, Hill and Brown told Sanders: "If you want to fool around, you're going to have to get us high." Sanders testified that he put the crack cocaine out on a table. He testified that there were beer and drinks everywhere in the room, and that he watched television. Sanders testified that several people started arriving at the room from elsewhere in the motel and that multiple people were coming and going from the room. At some point, Sanders purchased more crack cocaine from one of the people. Sanders testified that Hill informed him at some point that the crack cocaine was almost gone, and that Hill was waving a knife in his face. Sanders testified that Hill eventually put the knife away. Sanders testified that he was not worried about the incident and went back to watching television. About ten or fifteen minutes later, Hill again pulled a knife out and stuck it in Sanders's face, demanding that Sanders buy more crack. Sanders testified he became apprehensive. He testified:

> And I pretty much said, "you know, you can just leave. You know, I done bought you crack and I got the room, like you said." You know, I felt like I was getting hustled. I started, okay, you're getting hustled, bro. Yeah. Later, later, later. There's no later ever coming. We're not going to have sex, so I'm getting buffaloed

5

here and I'm getting my pockets dug into for nothing. So it's like, You all can just go, man. This is – no, this is no.

Sanders testified that Hill responded, "No, no baby, it's cool, it's cool, we just – you know, it's cool." Sanders testified that he stayed in the room because he was still hopeful of having sex.

Sanders testified that Hill later pulled a knife out, approached Sanders from behind and stuck the knife against his throat, slicing him. Hill then told Sanders that she would "just take" his belongings. Sanders testified that Hill then grabbed his wallet from his pocket, threw it to Brown, and told Brown to take the money from the wallet. At some point, Hill turned her head, and Sanders grabbed her wrist to move it away from his throat and elbowed Hill on the side of her head. Sanders testified that after he struck Hill, Hill stumbled backward and then "started swinging wild, just crazy[.]" Sanders testified that he was fearful of being cut or stabbed, so he kicked Hill in the chest to knock her back. Sanders testified that he then hit Hill in the mouth causing her to fall backward and hit her head on the sink. As Hill was on all fours and reaching for the knife, Sanders ran and kicked the knife away, and unintentionally kicked Hill in the face in the process of trying to knock the knife away. Sanders testified that his kick caused Hill to hit her head on the wall, and that Hill then became unconscious. Sanders testified that Brown also had a knife in her hand and threatened to stab Sanders if he did not "get off" Hill. Sanders told Brown to give him his wallet back, at which point Brown threw the wallet under a table and ran out of the door. Sanders testified that he then retrieved his wallet and noticed that there was about $250 missing. Sanders testified that he went to the room where Monty said he was staying seeking to get his money back. He testified that he never tied a sheet around Hill's neck, never strangled Hill, and did not place Hill's body in the basement. Sanders testified that as Hill lay unconscious on the ground in the room he did not believe Hill had died because nothing he did to

6

her was life-threatening. He testified that he "rocked her" "probably five or six times" to keep from getting stabbed. Sanders testified that he was not going to leave Hill in the room so he carried her down the steps and set her on a landing next to the motel office and notified someone in the office that Hill was hurt. He stated that he then went to look for his money and beat on a door to a room where Monty was staying. At some point, Sanders returned to the room where he encountered a man identified as Chris, who indicated that he knew where to find Brown. As Sanders left with Chris he noticed that Hill was not where he left her, and Sanders assumed that Hill awoke and left. At some point, Sanders encountered Timothy Murphy ("Murphy") and informed Murphy what had occurred in the motel room. Sanders attempted to sell the motel room to Murphy for bus fare. Murphy returned with Sanders to the room so that Murphy could inspect it, and Murphy paid two dollars for the room.[3] Sanders then testified he walked home where he learned that he did not have his keys. Upon returning to the motel, he knocked on the door of the room he sold to Murphy, and Murphy did not want to let Sanders in the room and informed Sanders that no keys were in the room. Sanders then looked for his keys in the lobby of the motel before returning home by foot.

Additional evidence was received at trial including a video of portions of Sanders's police interview, and surveillance videos, which apparently captured the lobby and parking lot of the motel as well as Sanders coming and going from his motel room.[4]

---

[3] Murphy testified at trial that he traded Sanders a piece of crack cocaine for the room.

[4] The exhibits admitted at trial are not contained in our record on appeal, and there is no indication that such exhibits were presented to the motion court. "The record on appeal must contain all of the proceedings necessary to a determination of the questions presented for decision, and matters omitted from the record will not be presumed to be favorable to the appellant." *State v. Watson*, 512 S.W.3d 94, 95 n.2 (Mo. App. W.D. 2017) (internal quotations omitted). "In fact, '[a]n omitted exhibit . . . may be taken as supporting the judgment of the trial court.'" *Id.* (citing *City of Lee's Summit v. Collins*, 615 S.W.2d 592, 595 (Mo. App. W.D. 1981)).

7

At the close of evidence, the jury was instructed on second degree murder, which required the jury to determine if Sanders knowingly caused Hill's death by kicking her and strangling her; and if he did not do so under the influence of sudden passion or in lawful self-defense. The jury was also instructed on voluntary manslaughter. Sanders also proffered an instruction on involuntary manslaughter that would have asked the jury to determine whether Sanders recklessly caused Hill's death by kicking her. This instruction did not ask whether Sanders caused Hill's death by kicking her *and strangling her*. The trial court refused Sanders's proffered involuntary manslaughter instruction.

The jury found Sanders guilty of second degree murder. The jury found that Sanders "caused the death of Sherilyn Hill by kicking her and strangling her[.]" The jury found that Sanders "was aware that his conduct was practically certain to cause the death of Sherilyn Hill, or that it was [Sanders's] purpose to cause serious physical injury to Sherilyn Hill[.]" The jury found that Sanders "did not do so under the influence of sudden passion arising from adequate cause[.]" Finally, the jury found that Sanders "did not act in lawful self-defense as submitted" in the self-defense instruction submitted at trial. The trial court sentenced Sanders to life in prison.

On direct appeal, Sanders argued that the trial court erred in refusing his proffered involuntary manslaughter instruction. The Missouri Supreme Court found that the trial court did not err in refusing the involuntary manslaughter instruction because Sanders's proffered instruction impermissibly deviated from the conduct charged in the greater offense of second degree murder by asking the jury to find whether Sanders recklessly caused Hill's death by kicking her instead of by kicking her *and* strangling her. *State v. Sanders*, 522 S.W.3d 212, 218-19 (Mo. banc 2017).

8

Sanders then filed a *pro se* Rule 29.15 motion. Appointed counsel timely filed an amended motion, which asserted, *inter alia*, that Sanders had received ineffective assistance of counsel due to his trial counsel's actions in (1) failing to request a "castle doctrine" instruction based on section 563.031.2(2); (2) failing to request a self-defense instruction based on section 563.031.3; and (3) failing to request a "correct" lesser-included offense instruction. An evidentiary hearing was held in which Sanders's trial counsel testified. Following the evidentiary hearing, the motion court issued a judgment denying relief on his claims. Following a timely motion to amend filed by Sanders, the trial court issued an amended judgment which again denied relief on Sanders's claims.

Sanders now appeals to this court.

**Standard of Review**

We review a motion court's judgment denying relief on a Rule 29.15 postconviction motion to determine whether the motion court's findings and conclusions are clearly erroneous. Rule 29.15(k); *Meiners v. State*, 540 S.W.3d 832, 836 (Mo. banc 2018). A judgment is clearly erroneous only if we are "left with a definite and firm impression that a mistake has been made." *Meiners*, 540 S.W.3d at 836 (citation omitted). "The movant has the burden of proving all allegations by a preponderance of the evidence." *Id.*; Rule 29.15(i).

To be entitled to postconviction relief based on ineffective assistance of trial counsel, the movant must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The movant must establish that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defendant. *Id.* If a movant makes an insufficient showing on either prong of the *Strickland* test, the movant's claim of ineffective assistance of counsel must be denied, and it is unnecessary to address the other prong. *Id.* at 697 ("If it is easier to

9

dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

To establish that counsel's performance was deficient, the movant must show "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The movant must overcome the "strong presumption that trial counsel's conduct was reasonable and effective." *Hosier v. State*, 593 S.W.3d 75, 81 (Mo. banc 2019) (quoting *Davis v. State*, 486 S.W.3d 898, 906 (Mo. banc 2016)). To overcome this presumption, "a movant must identify specific acts or omissions of counsel that, in light of all the circumstances, fell outside the wide range of professional competent assistance." *Id.* "The question in an ineffective assistance claim is not whether counsel could have or even, perhaps, should have made a different decision, but rather whether the decision made was reasonable under all the circumstances." *Johnson v. State*, 406 S.W.3d 892, 901 (Mo. banc 2013) (quoting *Henderson v. State*, 111 S.W.3d 537, 540 (Mo. App. W.D. 2003)).

The movant must also "affirmatively prove prejudice." *Strickland*, 466 U.S. at 693. To do so, the movant must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Hosier*, 593 S.W.3d at 81 (quotation omitted).

**Analysis**

Sanders raises three points on appeal, each of which contends that the motion court erred in overruling a claim of ineffective assistance of counsel. In his first point, he argues that the motion court erred in denying his claim of ineffective assistance of counsel, which was based on his counsel's failure to request a "castle doctrine" instruction based on section 563.031.2(2). In

10

his second point, he argues that the motion court erred in denying relief on his claim of ineffective assistance of counsel, which was based on his counsel's failure to request an instruction that included language based on section 563.031.3 regarding the lack of a duty to retreat before using force in self-defense. In his third point, he argues that the motion court erred in denying relief on his claim of ineffective assistance of counsel, which was based on counsel's failure to submit a "correct" lesser-included offense instruction for involuntary manslaughter.

## Point One

In his first point on appeal, Sanders contends that the motion court clearly erred in denying his claim of ineffective assistance of counsel, which was based on his counsel's failure to request a "castle doctrine" self-defense instruction based on section 563.031.2(2).

At the time of the events giving rise to the charged offense, the use of physical force in self-defense was justified in certain circumstances delineated in section 563.031. Generally, a person was authorized to "use physical force upon another person when and to the extent he or she reasonably believes such force to be necessary to defend himself or herself . . . from what he or she reasonably believes to be the use or imminent use of unlawful force by such other person[.]" § 563.031.1. An exception exists when the person claiming self defense was the initial aggressor, in which case, such person must first withdraw from the encounter and effectively communicate such withdrawal to the other person, who persists in continuing the incident with the use or threatened use of unlawful force. § 563.031.1(1)-(1)(a). The use of deadly force in self-defense is more limited. As relevant to this appeal, section 563.031.2 provides:

> 2. A person may not use deadly force upon another person under the circumstances specified in subsection 1 of this section unless:

11

(1) He or she reasonably believes that such deadly force is necessary to protect himself, or herself or her unborn child, or another against death, serious physical injury, or any forcible felony; [or]

(2) Such force is used against a person who unlawfully enters, remains after unlawfully entering, or attempts to unlawfully enter a dwelling, residence, or vehicle lawfully occupied by such person[.]

Section 563.031.2(1) is the provision that generally governs the use of deadly force in self-defense. Section 563.031.2(2) is a codification of what has long been commonly referred to as the "castle doctrine." *State v. Straughter*, 643 S.W.3d 317, 321 (Mo. banc 2022).

Under the castle doctrine, a person need not face death, serious physical injury or any forcible felony to respond with deadly force. Section 563.031.2(2). Rather, Missouri's castle doctrine provides that a person is justified in using deadly force "to defend himself or herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful force by such other person" [when] "[s]uch force is used against a person who unlawfully enters, remains after unlawfully entering or attempts to unlawfully enter a dwelling, residence, or a vehicle lawfully occupied by such person." Sections 563.031.1, 563.031.2(2).

*Id.* at 321-22.

At trial, Sanders argued that he used force in self-defense with respect to the charged conduct of kicking Hill when Hill threatened him with a knife and robbed him. With respect to the charged conduct of strangling Hill, Sanders's defense was that he did not engage in that conduct. The jury was instructed on general self-defense based on section 563.031.1. The jury was also instructed on the use of deadly force in self-defense based on section 563.031.2(1). The instruction provided that his use of force was justifiable and in lawful self-defense if Sanders was determined not to be the initial aggressor, and "he used only such force as reasonably appeared to be necessary to defend himself," *or*, if Sanders was not the initial aggressor, and he "reasonably believed that the use of deadly force was necessary to protect himself from death or serious physical injury from the acts of stabbing him or the commission of robbery by Sherilyn Hill[.]"

12

The jury found beyond a reasonable doubt that Sanders's use of force was not in lawful self-defense, meaning that the jury either found that he was the initial aggressor in the incident, or that Sanders used more force than reasonably appeared necessary to defend himself, or that Sanders used deadly force but did not reasonably believe that the use of deadly force was necessary to protect himself from death or serious physical injury from stabbing or from being robbed by Hill.

In his amended Rule 29.15 motion, Sanders alleged that his counsel was ineffective for failing to request a second self-defense instruction based on section 563.031.2(2). He alleged that there was evidence that Hill lied to Sanders about her purpose in going to his motel room, and that Hill unlawfully entered his motel room by agreeing to "exchange crack for sex" while "her actual purpose was to rob him of his crack and money and never have sex with him." Sanders argued that case law regarding what constitutes "unlawfully entering" for purposes of burglary should apply equally to the definition of "unlawful entry" for the castle doctrine, such that when consent to enter a dwelling "is obtained through deception or artifice, the entry is considered unlawful." *See State v. McGinnis*, 317 S.W.3d 685, 687 (Mo. App. W.D. 2010). Accordingly, Sanders alleged that the evidence supported an instruction based on section 563.031.2(2), which authorizes the use of deadly force in self-defense in less restrictive circumstances than section 563.031.2(1) when used by an occupant against a person who unlawfully enters or remains after unlawfully entering a dwelling.[5] He further alleged that his trial counsel provided an unconstitutionally deficient performance in not requesting such an

---

[5] There is no dispute in this matter that Sanders's motel room would meet the statutory definition of "dwelling."

13

instruction, and that, had such an instruction been given, there was a reasonable probability of an acquittal.

The motion court determined that Sanders failed to establish that his trial counsel's performance was deficient. The motion court found that there was no evidence at trial to support a castle doctrine defense. Thus, the motion court concluded that counsel could not be deemed ineffective for failing to request an instruction that lacked evidentiary support. With respect to prejudice, the motion court determined that there was no reasonable probability that the jury would have returned a different verdict had the jury been given the second self-defense instruction.

Sanders argues that the motion court clearly erred by concluding that his counsel's performance was not deficient. Specifically, he contends that the motion court failed to view the evidence in the light most favorable to the defendant with respect to whether the evidence supported the submission of the instruction. However, even assuming that the motion court erred in failing to view the evidence in the light most favorable to Sanders, the motion court's conclusion, that Sanders failed to establish his counsel's performance was deficient under *Strickland*, is not clearly erroneous. We "may affirm the judgment on any legal ground supported by the record if the motion court arrived at the correct result." *Kelley v. State*, 618 S.W.3d 722, 735 (Mo. App. W.D. 2021) (quoting *Greene v. State*, 332 S.W.3d 239, 246 (Mo. App. W.D. 2010)). In this matter, it was not error for the motion court to conclude that Sanders's counsel was not ineffective for failing to request an instruction which was not supported by the evidence. Moreover, Sanders failed to establish that his counsel's performance "fell outside the wide range of professional competent assistance." *Hosier*, 593 S.W.3d at 81.

14

In determining whether a self-defense instruction is warranted in a case, "the evidence is viewed in the light most favorable to the defendant." *State v. Whitaker*, 636 S.W.3d 569, 574 (Mo. banc 2022) (quotation omitted). A self-defense instruction is warranted "when substantial evidence is adduced to support it, even when that evidence is inconsistent with the defendant's testimony[.]" *Id.* "If the evidence tends to establish the defendant's theory, or supports differing conclusions, the defendant is entitled to an instruction on it." *Id.* In conducting this inquiry, a court cannot "supply missing evidence" or draw "unreasonable, speculative, or forced inferences." *See State v. Bruner*, 541 S.W.3d 529, 538 (Mo. banc 2018).

For the evidence to support the submission of an instruction modeled after section 563.031.2(2), it was necessary for the evidence at trial to support the finding that Hill made an unlawful entry into Sanders's motel room. For purposes of Chapter 563, RSMo, "unlawfully enter" was defined as follows: "a person unlawfully enters in or upon premises or private property when he or she enters such premises or private property and is not licensed or privileged to do so. . . ." § 563.011(9). "Remain after unlawfully entering" was defined as "to remain in or upon premises after unlawfully entering as defined in this section[.]" § 563.011(7).

All of the evidence in the record indicated that Hill had Sanders's permission to be in the motel room. In asserting that Hill's entry was nevertheless unlawful, Sanders argues that burglary cases have held that, when consent to enter a dwelling is obtained through deception, the entry is unlawful. *See State v. Thomas*, 70 S.W.3d 496, 502-03, 509 (Mo. App. E.D. 2002) (sufficient evidence of unlawful entry where burglary defendant requested to use phone of occupant and then hit occupant in the head and choked her until she died); *McGinnis*, 317 S.W.3d at 687-88 (sufficient evidence of unlawful entry where burglary defendant who had murdered his friend earlier in the night entered home of friend, lied to friend's wife about why he

15

was there, then raped friend's wife). Sanders asserts that these cases determining what constitutes an unlawful entry for purposes of the burglary statute (§ 569.160) should apply equally to determining when an unlawful entry has been made for purposes of section 563.031.2(2).[6]

We reject Sanders's contention that there was evidence establishing that Hill made an unlawful entry into Sanders's motel room. All of the evidence indicated that, although Sanders paid for the room, he obtained the room for the joint use of Hill and himself. Sanders's reliance on case law regarding what constitutes an unlawful entry for purposes of burglary is misplaced. The cases he cites are factually inapposite. This is not a case where Sanders was occupying a dwelling to which Hill then sought entry through deception. Rather, Sanders and Hill formed the plan to rent a motel room together, went to get the motel room together "to go party," entered the motel room together, and then jointly used the motel room together to ingest crack cocaine while sharing the utensils needed to ingest the crack cocaine. Moreover, although Sanders contends that Hill gained entry to the motel room by deceptively agreeing to "exchange crack for sex," the evidence indicates that an agreement to "exchange crack for sex" was not made until *after* Hill, Sanders and three other people had already entered the motel room. Sanders's arguments with respect to Hill's entry into the motel room seek to transform the castle doctrine from a doctrine that provides a broader authorization of the use of force in self-defense against *intruders* into a doctrine which provides the same authorization of the use of force against *invited guests* due to arguments or altercations that may later occur inside a dwelling. All of the evidence indicates

---

[6] Chapter 569 provided a definition for "enter unlawfully or remain unlawfully." Section 569.010(8) provided: "a person 'enters unlawfully or remains unlawfully' in or upon premises when he is not licensed or privileged to do so. . . ."

that Hill had permission to enter the motel room and that she was thus licensed or privileged to enter. Her entry was not unlawful. *See State v. Kendrick*, 550 S.W.3d 117, 124 (Mo. App. W.D. 2018).

But even assuming that there was sufficient evidence to present a question of fact regarding whether Hill's entry was unlawful, Sanders's counsel's performance did not fall below an "objective standard of reasonableness" as required by *Strickland*, 466 U.S. at 688, or indicate that his counsel "was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687. Under the circumstances presented to counsel at trial, it was far from clear that Sanders would be entitled to a castle doctrine instruction. Sanders essentially asserts that a reasonably competent counsel would have investigated case law for other offenses (burglary), would have attempted to extend that case law to a completely different statute (self-defense) under significantly different circumstances in a novel way, would have exerted significant time trying to convince the trial court that the case law on other subjects should be extended to Sanders's situation despite obvious factual distinctions between his situation and the burglary cases cited in this appeal, and then would have spent time arguing and convincing a jury regarding a tenuous at best factual issue for which there was little evidence (whether Hill's permissive entrance into Sanders's motel room was in fact unlawful). In this matter, instead of completing all of those steps, his counsel made the reasonable decision to argue that Sanders used force in self-defense when he had a knife to his neck and was being robbed. Although a castle doctrine defense, if submissible, and if counsel had elected to go that route, would have provided a broader authorization of the use of deadly force, Sanders's counsel ably presented arguments regarding self-defense that also encompassed the use of deadly force and legitimately could have led to his acquittal had the jury believed his testimony. The jury ultimately found Sanders guilty of second

17

degree murder. However, "the distorting effects of hindsight" have little bearing on whether counsel's performance was unconstitutionally deficient. *Id.* at 689. "The question in an ineffective assistance claim is not whether counsel could have or even, perhaps, should have made a different decision, but rather whether the decision made was reasonable under all the circumstances." *Johnson*, 406 S.W.3d at 901. Sanders failed to overcome the presumption that his counsel's performance fell outside "the wide range of reasonable professional assistance[.]" *Strickland*, 466 U.S. at 689. We are not persuaded that, in light of "the strong presumption of reliability," the result of Sanders's trial "is unreliable because of a breakdown in the adversarial process[.]" *See id.* at 696.

Further, even if counsel provided a deficient performance (which we do not find), the motion court's determination that Sanders had failed to establish prejudice under *Strickland* is not clearly erroneous. It was not clearly erroneous for the motion court to conclude that Sanders had failed to establish a reasonable likelihood that the jury would have acquitted him of second degree murder if it had been instructed pursuant to section 563.031.2(2).

Sanders argues at length that the motion court applied the wrong standard in assessing prejudice. Sanders's arguments in this respect relate to a paragraph of the judgment in which the motion court stated that Sanders failed to show that the outcome would have been different. However, in the following sentence, the motion court elaborated: "There is no reasonable probability the jury would have returned a different verdict." Later, the motion court's judgment stated that the refusal to submit a self-defense instruction based on the castle doctrine was "not outcome determinative."

Sanders argues that, in *Deck v. State*, 68 S.W.3d 418 (Mo. banc 2002), the Missouri Supreme Court reaffirmed the distinction between the showing of prejudice necessary to justify

18

reversal with respect to plain error on direct appeal and the showing required under *Strickland*, such that a determination of no manifest injustice on direct appeal is not dispositive of the *Strickland* prejudice inquiry. *See id.* at 427-28 (noting that *Strickland* rejected an outcome determinative test). The specific "outcome-determinative" test that *Strickland* rejected, however, was one which would have placed the burden on the defendant to establish that "counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland*, 466 U.S. at 693. It was *this* "outcome-determinative standard" that *Strickland* rejected, *id.*, and which *Deck* recognized *Strickland* rejected. *Deck*, 68 S.W.3d at 427.

However, after *Deck*, Missouri Courts have often used the descriptor "outcome determinative" to describe the showing of prejudice necessary to justify reversal, even when describing the showing of prejudice on direct appeal with a test similar to the test prescribed by *Strickland*. *See, e.g., State v. Johnson*, 207 S.W.3d 24, 42 (Mo. banc 2006) ("A finding of outcome-determinative prejudice expresses a judicial conclusion that the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all evidence properly admitted, there is a reasonable probability that the jury would have acquitted but for the erroneously admitted evidence."). Courts have at times described the requisite showing of prejudice on direct appeal as such even though *Deck* makes clear that "[t]he standard for finding prejudice in the context of preserved error [on direct appeal] is lower than the standard for finding error under *Strickland*, and both are lower than the plain error standard [on direct appeal]." *Deck*, 68 S.W.3d at 427 n.5.

In this matter, the motion court accurately defined the requisite showing of prejudice under *Strickland*, stating: "In order to show prejudice, movant must show that there is a *reasonable probability* that, absent the alleged error, the results of the proceeding would have

19

been different." (emphasis in original). The motion court further stated, correctly, that a reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. When specifically addressing Sanders's claim of ineffective assistance, the motion court stated: "Notwithstanding trial counsel's performance, Movant has failed to present any evidence that, had this second self-defense instruction been given, the outcome would have been different. *There is no reasonable probability the jury would have returned a different verdict.*" (emphasis added). Although the motion court described the *Strickland* showing of prejudice as outcome determinative, there is no indication that the motion court deviated from applying the standard set forth in *Strickland* or that the motion court applied the standard which *Strickland* rejected. Despite the use of the descriptor "outcome determinative," it is not the descriptor utilized but the standard actually applied that determines whether the court applied the wrong standard. Here, the record indicates the motion court applied the standard *Strickland* prescribes. Accordingly, we reject Sanders's contention that the motion court applied the wrong standard in assessing prejudice under *Strickland*.

In determining whether a movant has sufficiently established a reasonable probability of a different outcome, a court "must consider the totality of the evidence" before the jury. 466 U.S. at 696. *Strickland* instructs courts to accept as true the factual findings that will have been unaffected by the asserted error, and consider the potential effect of the asserted error on the remaining findings. *Id.* at 696-97.

In this matter, a number of the jury's findings were unaffected by the alleged error of counsel in submitting the self-defense instruction based on section 563.031.2(1) rather than one based on section 563.031.2(2). The jury found (1) that Sanders "caused the death of Sherilyn Hill by kicking her and strangling her, and" (2) that Sanders "was aware that his conduct was

20

practically certain to cause the death of Sherilyn Hill, or that it was [his] purpose to cause serious physical injury to Sherilyn Hill," and (3) that Sanders "did not do so under the influence of sudden passion arising from adequate cause," and (4) that Sanders "did not act in lawful self-defense as submitted" in the self-defense instruction submitted at trial. Only the fourth finding would have potentially been affected by an additional self-defense instruction. Thus, *Strickland* instructs us to accept as true the jury's findings that Sanders knowingly caused Hill's death by kicking her and strangling her.

The obvious problems with Sanders's assertions that he was prejudiced by his counsel's failure to submit a castle doctrine instruction are (1) that his defense to the conduct of strangling Hill was that he did not engage in such conduct rather than that he strangled Hill to defend himself, and (2) that there is no evidence in the record indicating that he strangled Hill at a time while he was under a reasonable belief that Hill was using or would imminently use force.

First, Sanders testified that he never strangled Hill. The jury found that he knowingly caused Hill's death by kicking her and strangling her. The jury's finding that he knowingly caused Hill's death by strangling her would not be affected by a castle doctrine instruction.

Second, all of the evidence at trial indicated that Sanders kicked Hill until Hill was unconscious. There was no evidence that Hill ever regained consciousness while in Sanders's presence. Thus, there was no evidence that Hill ever posed a threat to Sanders after she fell unconscious. Although the castle doctrine may justify the use of deadly force in self-defense under broader circumstances than section 563.031.2(1), the castle doctrine "does not apply if the threat of unlawful force has subsided[.]" *Straughter*, 643 S.W.3d at 323. Sanders advances no theories as to how the jury was likely to find that an unconscious Hill continued to pose a threat of unlawful force.

21

Sanders cites to numerous cases with completely different factual scenarios in which courts have previously found prejudice based on the failure to give a self-defense instruction. We find these cases almost entirely inapposite. The flaw with Sanders's attempts to establish prejudice are that he fails to adequately address the evidence at his trial and advance with any specificity or persuasive effect a theory as to how a jury was reasonably likely to find that he kicked *and strangled* Hill in self-defense if instructed differently. The motion court found that Sanders failed to establish a reasonable probability of a different verdict if the jury had been instructed on the castle doctrine. This conclusion is not clearly erroneous.

Point one is denied.

### Point Two

In his second point on appeal, Sanders argues that the motion court erred in overruling his claim of ineffective assistance of trial counsel which alleged that his counsel was ineffective by failing to request a self-defense instruction that reflected the language of section 563.031.3, which would have instructed the jury that Sanders had no duty to retreat before using force to defend himself.

With respect to counsel's performance, the motion court found that Sanders's claim was "seemingly based" on his previous argument that a self-defense instruction based on the castle doctrine should have been submitted. In finding counsel's performance was not deficient, the motion court found that his "no duty to retreat" claim of ineffective assistance failed for the same reason as did his castle doctrine claim of ineffective assistance – because there was no evidence to support an instruction based on the castle doctrine. The motion court also found that Sanders failed to establish prejudice under *Strickland* because there was no reasonable probability that

22

the submission of an instruction modeled after section 563.031.3 would have resulted in a different outcome.

Sanders argues that the motion court erred in finding that his ineffective assistance claim based on section 563.031.3 was a rehash of his ineffective assistance claim based on section 563.031.2(2). Sanders asserts that section 563.031.2(2) applies when "force is used against a person who unlawfully enters, remains after unlawfully entering, or attempts to unlawfully enter a dwelling, residence, or vehicle lawfully occupied by such person[.]" That is, to be applicable, section 563.031.2(2) requires that an unlawful entry or attempt at unlawful entry has been made. Sanders points out that the language of section 563.031.3 contains no language indicating that the person against whom force is used must be an unlawful entrant or attempted entrant. Thus, Sanders asserts that section 563.031.3 applies to a broader set of circumstances, and, therefore, an instruction based on 563.031.3 could be warranted even if an instruction based on section 563.031.2(2) was not warranted. Although it would appear that Sanders is correct that section 563.031.3 does apply to a broader set of circumstances than does section 563.031.2(2), it is unnecessary to address the motion court's conclusion with respect to counsel's performance because the motion court's conclusion with respect to *Strickland*'s prejudice inquiry is not clearly erroneous. *See Hounihan v. State*, 592 S.W.3d 343, 348 n.3 (Mo. banc 2019) (insufficient showing on either prong of *Strickland* renders evaluation of other prong unnecessary).

The motion court did not clearly err in determining that Sanders failed to establish a reasonable probability that an instruction modeled after section 563.031.3, had it been given, would have resulted in a different outcome. Such an instruction would not have significantly altered the evidentiary picture before the jury. *See Strickland*, 466 U.S. at 695-96 ("Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the

23

entire evidentiary picture, and some will have had an isolated, trivial effect.").  That is, even had the instruction been given, it would not have given the jury any additional basis for concluding that Sanders reasonably believed that he needed to kick and strangle Hill to death.  In this matter, the jury was presented with differing accounts of what occurred in the motel room in the form of testimony from Brown and Sanders. Brown testified that Sanders attacked Hill at a time when Hill's back was turned to Sanders and when Hill was not holding a knife.  Sanders testified that he used force to defend himself when Hill held a knife to his throat and cut him.  In either scenario, there is no indication that an instruction regarding the lack of duty to retreat was likely to have swayed the jury.  If Brown's account of events were believed, then the lack of a duty to retreat would not be expected to factor in the determination, as Brown testified that Hill was smoking a pipe by a mirror when Sanders approached her from behind and repeatedly kicked her.  Conversely, if Sanders's account of events were believed, then there is no reason to believe that a jury would think that Sanders was required to retreat before defending himself from a person holding a knife to his neck who had just cut him and robbed him, in that the jury was instructed that force may be used to the extent the actor reasonably believes it necessary to defend himself from what he reasonably believes to be the use of unlawful force by another person.

To the extent that Sanders argues that the lack of a "no duty to retreat" instruction allowed the State to argue in closing that Sanders had a duty to retreat before using force in self-defense, we disagree.  The State's argument referenced by Sanders did not relate to the duty to retreat *before* using force, but instead related to the reasonableness of the force exerted by Sanders, and how it was unnecessary for Sanders to exert so much force; i.e., that the outcome would perhaps have been different if Sanders had used only reasonable force instead of repeatedly and unnecessarily kicking Hill:

24

And here's the deal. If she waves the knife and if he turns around and maybe he just punches her in the face and she backs up and he leaves, we aren't here. Because he acted in lawful self-defense and he had a right to do that.

But then you kick her to the floor and the knife is gone. And then you keep kicking and you keep coming because your ego's been wounded because some woman has put a knife in your face. And then you kick her again and again and again. And not just on her head. And not just in her face. But all over her body.

This language in the State's argument relates to the reasonableness and necessity of the continued use of force rather than suggesting that Sanders was required to retreat before an initial use of force in self-defense.

Moreover, the jury found that Sanders knowingly caused Hill's death by kicking her *and* strangling her. There was no evidence before the jury that Sanders strangled Hill in self-defense. Sanders testified that he never engaged in such conduct. Nevertheless, the jury found that Sanders did knowingly cause Hill's death by strangling her. This finding indicates that the jury inferred that Sanders did so while Hill was unconscious, given that there was no evidence whatsoever that Hill regained consciousness after being kicked repeatedly by Sanders. Whether or not a "no duty to retreat" instruction had been given, Sanders would still not have been justified in tying a bed-sheet in a knot around the neck of an unconscious Hill and using it to knowingly cause her death by strangulation. This finding would be entirely unaffected by an instruction regarding the lack of a duty to retreat. The motion court concluded that Sanders failed to establish a reasonable probability of a different outcome if the jury had been instructed based on section 563.031.3. This conclusion was not clearly erroneous.

Point Two is denied.

25

**Point Three**

In his third point on appeal, Sanders argues that the motion court erred in overruling his claim of ineffective assistance of counsel, which alleged that counsel was ineffective by failing to submit a "correct" lesser-included offense instruction for the offense of involuntary manslaughter.

At trial, the jury was instructed on second degree murder and voluntary manslaughter. The verdict director for second degree murder instructed the jury to determine whether Sanders knowingly caused Hill's death by kicking her and strangling her; whether he did so without the influence of sudden passion; and whether he did not act in lawful self-defense. The verdict director for voluntary manslaughter asked the jury to determine whether Sanders knowingly caused Hill's death by kicking her and strangling her; and whether he did not act in lawful self-defense. Trial counsel proffered an instruction for involuntary manslaughter, which would have required the jury to determine whether Sanders recklessly caused Hill's death by kicking her. The proffered instruction, which did not require the jury to determine whether Sanders caused Hill's death by kicking her *and strangling her*, was rejected by the trial court.

The jury found Sanders guilty of second degree murder. The trial court sentenced Sanders to life imprisonment. On direct appeal, Sanders argued that the trial court erred in rejecting his proffered instruction on involuntary manslaughter. The Missouri Supreme Court determined that involuntary manslaughter is a "nested" lesser-included offense of second degree murder, such that the trial court would have been required to give "a timely and properly requested instruction for involuntary manslaughter." *State v. Sanders*, 522 S.W.3d 212, 217 (Mo. banc 2017). The Court then determined that the trial court did not err in refusing Sanders's proffered involuntary manslaughter instruction because his proffered involuntary manslaughter

26

instruction impermissibly deviated from the conduct charged in the greater offense of second degree murder by asking the jury to find whether Sanders recklessly caused Hill's death by kicking her instead of by kicking her *and* strangling her. *Id.* at 218-19.[7]

In his amended Rule 29.15 motion, Sanders alleged that he received ineffective assistance of counsel when his trial counsel failed to request and submit a "correct" involuntary manslaughter instruction, and that he was prejudiced by his counsel's performance because there was a reasonable probability of a different outcome had a proper involuntary manslaughter instruction been provided. The amended motion pointed out that on direct appeal it was determined that the trial court would have been required to give a proper involuntary manslaughter instruction and that counsel's proffered instruction was determined to be improper. The amended motion further alleged that trial counsel lacked a reasonable strategy in submitting the improper instruction based on counsel's testimony at the evidentiary hearing, and because no reasonable trial strategy would justify counsel's submission of an improper instruction.

At the evidentiary hearing, counsel testified that she had offered an involuntary manslaughter instruction, and that she was aware that the Missouri Supreme Court had found the instruction she offered to be erroneous during Sanders's direct appeal. Counsel was then questioned regarding her strategy with respect to the submission of the instruction:

> Q. Did you have any strategic reason for not offering a lesser included instruction that matched the charging instrument and greater instruction?
>
> A. During the jury instruction conference, there was a conference that took place off the record with the judge and [the prosecutor] and myself, along with my co-counsel. There was lengthy debate about whether we could submit the involuntary manslaughter instruction. Judge Messina at the time I believe would only allow us

---

[7] Two judges dissented from the majority opinion, contending that the proffered instruction was proper, and that the trial court erred in failing to instruct the jury on the nested lesser-included offense of involuntary manslaughter. *Sanders*, 522 S.W.3d at 219 (Draper & Stith, J.J., dissenting).

to submit it that way because she did not believe that strangulation could be reckless, and thus we could not submit it that way.

Q. Did you have any reason for not also submitting it including both the strangulation and the kicking?

A. I don't remember. I don't think so.

Following the evidentiary hearing, the motion court determined that Sanders's trial counsel was not ineffective and that Sanders was not prejudiced. In particular, the motion court found that counsel had offered the involuntary manslaughter instruction that Sanders contends counsel should have offered (based on the conduct of kicking and strangulation), but that the trial court rejected the instruction. Citing *Harrell v. State*, 429 S.W.3d 452 (Mo. App. S.D. 2014), the motion court noted that claims of trial court error are generally not cognizable in Rule 29.15 motions and that such motions "cannot be used to obtain review of matters which were or should have been raised on direct appeal." *Id.* at 456-57. The motion court then concluded that, because counsel had offered a proper involuntary manslaughter instruction which was rejected, and because no claim with respect to that trial court error was made on appeal, Sanders had failed to establish that his counsel was ineffective or that he was prejudiced.

The motion court's findings and conclusions are not clearly erroneous. We are not left with a definite and firm impression that the motion court was mistaken in finding that counsel did request an involuntary manslaughter instruction based on the conduct of kicking *and* strangling. As Sanders's claim of ineffective assistance is based on counsel's failure to request an instruction that the motion court found counsel requested, the motion court did not clearly err in determining that Sanders failed to establish that his counsel's performance was deficient. Although counsel's testimony at the hearing indicated that the instruction based on the conduct of kicking *and* strangling was requested during an off-the-record instruction conference, this

28

testimony did support the trial court's finding that counsel requested the instruction, which the trial court rejected. Although counsel failed to make a record of this request, "[c]laims for post-conviction relief based on trial counsel's failure to adequately preserve issues for appeal are not cognizable under Rule 29.15." *Glasgow v. State*, 218 S.W.3d 484, 489 (Mo. App. W.D. 2007) (quotations omitted). For an error of trial counsel to even state a cognizable claim of ineffective assistance of trial counsel, a movant must allege that trial counsel's error deprived the movant of a fair trial. *McLaughlin v. State*, 378 S.W.3d 328, 355 (Mo. banc 2012).

In this matter, Sanders alleged that he was deprived of a fair trial due to counsel's failure to request an instruction, which the motion court found *was* requested by his counsel, albeit off-the-record. Thus, the motion court did not clearly err in determining that Sanders's counsel's performance was not deficient for failing to take an action that the motion court found trial counsel did, in fact, take. Although counsel did not make a record of offering that instruction, and this omission limited the grounds which could have been raised on direct appeal, the "preservation of an issue for appeal cannot affect the fairness of the trial; preservation only affects rights and standards on appeal." *McCauley v. State*, 380 S.W.3d 657, 662 (Mo. App. S.D. 2012) (quoting *Johnson v. State*, 283 S.W.3d 279, 282 (Mo. App. S.D. 2009)). With respect to the fairness of Sanders's trial, the motion court found that his trial counsel did perform the act that Sanders asserts should have been performed. Counsel's failure to make a proper record of that act did not affect the fairness of Sanders's trial, but instead related to potential grounds for appeal. Thus, to the extent that his claim relates to counsel's failure to make a record of the request for the instruction, such a claim does not relate to the fairness of his trial and is not cognizable in a Rule 29.15 proceeding. The motion court did not clearly err in finding that Sanders failed to establish that his counsel's performance was unconstitutionally deficient.

Point three is denied.

## Conclusion

The judgment is affirmed.

_____
Thomas N. Chapman, Judge

All concur.

30