**STATE of Missouri, Respondent,**

v.

**Christopher SANTILLAN,
Defendant–Appellant.**

No. 74279.

Missouri Court of Appeals,
Eastern District,
Division Three.

July 27, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 1, 1999.

Application for Transfer Denied
Oct. 26, 1999.

---

Alan G. Kimbrell, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Cheryl Caponegro Nield, Asst. Atty. Gen., Jefferson City, for respondent.

LAWRENCE E. MOONEY, Judge.

Christopher Santillan ("Defendant") appeals the judgment entered on his convictions for murder in the first degree, RSMo section 565.020, and armed criminal action, RSMo section 571.015.[1] Defendant contends that the trial court erred in: (1) allowing the prosecuting attorney to ask Defendant what he told his previous lawyer; (2) allowing the introduction of evidence of an Uzi submachine gun, found in

1. All statutory reference are to RSMo (1994).

Defendant's home, that was not the murder weapon; (3) permitting the Prosecutor to question Defendant if this was "the first time" he told "this story" in "six years," which implied that Defendant had an obligation to present his self-defense claim; and (4) refusing to quash the jury panel and continue the case after the pre-assignment judge told potential jurors that one of the cases they may hear had been previously tried. We affirm.

*Facts*

The current appeal is taken following Defendant's second trial for the murder of Vinay Singh ("Victim"). During his first trial, Defendant contended that he did not murder Victim, but the jury nonetheless found him guilty of both first-degree murder and armed criminal action. Defendant appealed the convictions, and this Court affirmed the trial court's decision. The Missouri Supreme Court took transfer of the case, and reversed the trial court decision because a second-degree murder instruction was not given to the jury. *State v. Santillan*, 948 S.W.2d 574 (Mo. banc 1997). Defendant was retried, and again found guilty of both first-degree murder and armed criminal action. This appeal follows.

The evidence at trial, which we view in the light most favorable to the verdict, *State v. Owsley*, 959 S.W.2d 789, 791 (Mo. banc 1997), reveals the following:

In 1991, Victim was a student at Parkway Central High School, and was friends with both Defendant and Melissa Ray ("Missy"). During the summer of 1991, Victim began dating Missy, whom Defendant was also interested in romantically. Defendant became extremely distraught over the situation, which was evidenced by Defendant's suicide attempt on August 15, 1991. On that date, Defendant, Victim and Missy were all meeting at Missy's house. When the Victim arrived at Missy's home, they went looking for Defendant and found

him in a nearby parking lot with a gun pointed at his face and bullets strewn on the ground. Defendant told Victim and Missy that he could not stand the fact that his best friend was in love with the same girl he loved. Missy successfully removed the gun from Defendant's control, and returned it to his mother.

Approximately six months later on January 31, 1992, Victim spoke on the telephone with his friend Becky Seymour between 2:00 and 2:30 a.m. Victim told Becky that he was getting ready to go out with Defendant to get something to eat. Before leaving his home, Victim stopped by his father's bedroom to tell him he was going with Defendant and would return home in a half hour. Phone records confirm that Defendant telephoned Victim's home at 2:11 a.m., shortly before Victim left his house. Victim never returned home.

On March 2, 1992, about four weeks after Victim's disappearance, his body was found in a shallow grave behind the Conway Day School. Later that evening, the Chesterfield Police Department questioned Defendant, who denied having any contact with Victim on the night he was murdered. He further stated that the last time he saw Victim alive was during the last weekend of January 1992. Defendant denied owning any guns himself, and also denied that his family owned guns.

In addition to deceiving police officers, Defendant also admitted he did not tell his parents the truth about his role in Victim's death, and he lied to his mother when he told her that he did not kill Victim.

Police searched Defendant's automobile on March 3, 1992, and noticed small spots of a red substance in a splatter pattern on the inside of the passenger side windshield. The officer also noticed dark red smudges on the passenger's and driver's seats of the car, and on the handhold above the vehicle's passenger door. The red substances were later identified as blood, which had a genetic profile consistent with that of Victim's blood.

Police also examined glass found in the parking lot at the Conway Day School where the Victim's body was discovered, and determined it to be indistinguishable from glass found in Defendant's vehicle.

Based upon the evidence obtained from Defendant's automobile and the crime scene, the police obtained a search warrant for Defendant's home. While executing the warrant, officers recovered a .357 Magnum, a .44 caliber weapon and ammunition. Lab tests determined that the bullet jacket fragment recovered from Victim's body was conclusively fired from the .44 Magnum revolver recovered from Defendant's home.

Defendant's defense at his second trial was that Victim was using drugs, and had asked to borrow a gun for protection from drug dealers. Defendant testified he telephoned Victim during the early morning hours of January 31, 1992, picked him up at his home, and then drove to the abandoned Conway Day School to give Victim the .44 Magnum he wanted for protection. According to Defendant, Victim became agitated in the car and reached for the gun. Defendant testified he believed Victim was going to shoot him, so he instead shot the Victim . . . twice. Defendant further admitted he then put a rock through his car window and slashed his vehicle's tires so it would appear his car was vandalized.

On retrial, the jury again found Defendant guilty of first-degree murder and armed criminal action. He was sentenced to life imprisonment without parole on the murder count, and a consecutive term of life imprisonment on the armed criminal action count. Defendant appeals the judgment entered upon his convictions.

### *Analysis*

### I. Attorney–Client Privilege

Defendant's first Point Relied On states:

The trial court erred in allowing the prosecuting attorney to ask defendant

what he told his lawyer, in that such cross-examination violated defendant's attorney-client privilege, and defendant did not waive that privilege, and use of defendant's exercise of his sixth amendment rights in a subsequent retrial chills the exercise of that right; Defendant was prejudiced by said error, in that his forced admission that he had lied to his attorney about his involvement in Vinay Singh's death destroyed his credibility.

Defendant complains of the following cross-examination of Defendant by the Prosecutor:

Q (by Prosecutor): And it still bothers you a great deal about what happened that night, obviously; isn't that right?

A (by Defendant): Yes, sir.

Q: And I guess it hurts more the first time you tell the story to people?

A: Yes, sir.

Q: Because you didn't tell this story for six years that you just told the jury here today, did you?

A: No, sir.

Q: What was the story you were telling before?

A: I told my lawyer in '94, sir.

Q: You told your lawyer in '94?

A: Yes, sir.

Q: That was two years after this happened?

A: Yes, sir.

Q: You had a lawyer before that, though, up until '94, didn't you?

A: Yes, sir.

Q: Tell the jury what you were telling him.

A: I was – I told him that I didn't do it.

Q: You told him over and over again that you didn't do it, didn't you.

A: I didn't know what to tell him.

Q: Isn't that what you told him, though? You knew what to tell him. You told him you didn't do it, didn't you.

A: Yes, sir.

Q: And you looked him in the eye, didn't you.

A: Yes, sir.

Q: And he believed you, didn't he.

A: Yes, sir.

Prior to Defendant's testimony set forth above, an in-chambers discussion occurred during which defense counsel expressed concern that "it would be improper, highly prejudicial and inflammatory if the [Prosecutor is] allowed to start getting into prior conversations with a lawyer and suggests that he allow [sic] another defense to go forward which gets into the issue of a prior trial, a prior defense, different defense." Defense counsel did not specifically object either in-chambers or in front of the jury to such testimony as a violation of the attorney-client privilege. Defendant nonetheless contends on appeal that such questioning violated his attorney-client privilege because it forced him to divulge conversations he had with his prior trial counsel. However, a party's failure to make a timely objection to the admissibility of evidence waives any right to challenge its admissibility on appeal. *State v. Martin*, 852 S.W.2d 844, 850 (Mo. App. W.D.1992). In addition to the objection being timely, the allegations of error made to the trial court must be "sufficiently definite to direct the court's attention to the particular acts or rulings asserted to be erroneous" in order to preserve the error for appellate review. *Skelton v. General Candy Co.*, 539 S.W.2d 605, 610 (Mo.App. E.D.1976), *citing Pasley v. Newton*, 455 S.W.2d 43, 47 (Mo.App. W.D. 1970).

Moreover, Defendant's motion for new trial does not include any allegation of error regarding the violation of attorney-client privilege. Rule 29.11(d) states in pertinent part that "allegations of error to be preserved for appellate review must be included in a motion for new trial." *See also State v. Nave*, 694 S.W.2d 729, 734–735 (Mo.1985). Therefore, this issue is

unpreserved and is reviewable, if at all, for plain error. *See* Rule 30.20.

Plain error does not embrace all trial error, and this court's discretion to reverse a conviction on the basis of plain error should be utilized sparingly. *State v. Roberts*, 948 S.W.2d 577, 592 (Mo. banc 1997). "Plain error is evident, obvious and clear error." *State v. Long*, 925 S.W.2d 220, 222 (Mo.App. E.D.1996), *quoting State v. Bailey*, 839 S.W.2d 657, 661 (Mo.App. W.D.1992). Relief under the plain error review standard is granted only where the alleged error will so substantially affect a defendant's rights that a manifest injustice or a miscarriage of justice inexorably results if left uncorrected. *State v. Tokar*, 918 S.W.2d 753, 769–770 (Mo. banc 1996). A showing of mere prejudice is not enough. *State v. Kalagian*, 833 S.W.2d 431, 434 (Mo.App. E.D.1992). Moreover, a defendant bears the burden of demonstrating manifest injustice or miscarriage of justice. *State v. Baller*, 949 S.W.2d 269, 272 (Mo.App. E.D.1997).

Defendant failed to meet his burden. Defendant claims his rights were violated and his credibility destroyed by the prosecutor's questions. But before the testimony turned to attorney-client communications, a matter first broached by Defendant, Defendant had already admitted that he had not told the truth to all the world for six years about the death of his best friend. It is difficult to fathom what additional impeachment his credibility suffered when it was revealed that his attorney was among the many victims of Defendant's deceit.

We need not determine whether Defendant waived the attorney-client privilege or opened the door to the Prosecutor's questions. Given the negligible impact the prosecutor's questions had on Defendant's already diminished credibility, coupled with the overwhelming evidence of guilt in this case, we find Defendant failed to prove that the alleged error caused manifest injustice. Point one denied.

## II. Introduction of Evidence of an Uzi Machine Gun

Defendant's second argument on appeal is that the trial court erred in allowing the Prosecutor to introduce evidence that an Uzi machine gun, that was not the murder weapon, was found in Defendant's parents' bedroom. According to Defendant, the introduction of the photographs of the Uzi and testimony as to its location was designed only to persuade the jury that the Santillan family was violent, and therefore prejudiced Defendant. The State, however, contends that evidence of the Uzi: (1) showed Defendant had access to guns, (2) corroborated the testimony of Missy, who stated she had seen weapons at the Santillan house, (3) corroborated the testimony of Arty Johnson, Defendant's high school friend, whose credibility had been attacked by defense counsel, and (4) showed that Defendant's story on retrial, that he was giving Victim the .44 Magnum murder weapon for protection from drug dealers, was improbable given that Defendant had access to the more powerful Uzi. Further, the State argues the Uzi was only mentioned briefly, and the evidence against Defendant was so overwhelming that the exhibits did not prejudice him.

The trial court has broad discretion in admitting relevant photographic evidence. *State v. Weems*, 840 S.W.2d 222, 229 (Mo. banc 1992). Evidence is deemed relevant if it logically tends to prove or disprove a fact in issue or corroborates evidence which itself is relevant and bears on a principal issue. *State v. Wood*, 596 S.W.2d 394, 402 (Mo. banc 1980). In a criminal proceeding, questions of relevance are left to the discretion of the trial court and its ruling will be disturbed only if an abuse of discretion is shown. *State v. Lee*, 556 S.W.2d 25, 32 (Mo. banc 1977). We defer to the trial court's discretion, and refuse to disturb its decision as to the logical relevance of such evidence.

However, not all relevant evidence is admissible in that to be properly admissible the probative value of the evidence must also outweigh its prejudicial effect. We review trial court decisions regarding the admissibility of evidence "for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *State v. Tokar*, 918 S.W.2d 753, 761 (Mo. banc 1996), *quoting State v. McMillin*, 783 S.W.2d 82, 98 (Mo. banc 1990). Further, evidence which might be considered prejudicial in a close case is harmless where evidence of guilt is strong. *McMillin*, 783 S.W.2d at 99.

Here, the trial court's exercise of its broad discretion in admitting the photographic evidence did not prejudice Defendant. The location of the Uzi in Defendant's parents' bedroom was merely mentioned and was not emphasized during Defendant's trial. To the contrary, the Uzi photographs constituted only two of eighty-three exhibits admitted by the parties during the trial's duration. In addition, because the evidence of Defendant's guilt was so strong, any prejudicial impact he suffered based upon the Prosecutor's fleeting mention of the Uzi and introduction of the photographs was harmless, and did not prevent him from receiving a fair trial.

Moreover, Defendant's objection to the oral testimony of Officer Van Ness, during which he described finding the automatic weapon at the Defendant's home, was not properly objected to at trial and therefore not preserved for our review. Once again, Defendant is only entitled to plain error review. Rule 29.12(b). Given our conclusion above that the introduction of Uzi photographs was not prejudicial to Defendant, it is clear that Officer Van Ness' testimony, which merely described ·the search of Defendant's home and the location of the Uzi in a file cabinet in Defendant's parents' bedroom, did not

cause manifest injustice. Point two denied.

### III. Prosecutor's Comments on Defendant's Post–Arrest Silence

Defendant next argues on appeal that the trial court committed plain error by allowing the Prosecutor to ask Defendant if his testimony on direct was "the first time" he told "this story" in "six years," in that such question improperly commented on Defendant's post-arrest silence.

In particular, Defendant objects to the following questions:

Q (by Prosecutor): And it still bothers you a great deal about what happened that night, obviously; isn't that right?

A (by Defendant): Yes, sir.

Q: And I guess it hurts more the first time you tell the story to people?

A: Yes, sir.

Q: Because you didn't tell this story for six years that you just told the jury here today, did you?

A: No, sir.

Defendant concedes his trial counsel failed to timely object to this line of questioning, and therefore we afford this claim only plain error review. Rule 29.12(b).

Defendant is correct in asserting that the State may not make use of a criminal defendant's post-arrest silence where that silence is the result of an exercise of defendant's constitutional right. *Doyle v. Ohio*, 426 U.S. 610, 618, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Where a State has induced silence by implicitly assuring through the *Miranda* warning that a defendant's silence would not be used against him, it is fundamentally unfair for the state to refer to that silence. *Fletcher v. Weir*, 455 U.S. 603, 606, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982). However, where a defendant's post-arrest silence is not based upon a *Miranda* warning, or by an express assertion of the Fifth Amendment right to silence, a defendant's due process is not violated where he voluntarily takes the stand and is subject to cross-examination. *State v. Hill*, 823 S.W.2d 98, 100–101 (Mo.

App. E.D.1991), *citing Fletcher*, 455 U.S. at 607, 102 S.Ct. 1309. In these situations, the judge and jury under its own rules of evidence are left to resolve the extent to which post-arrest silence may impeach a criminal defendant's own testimony. *Id.* Therefore, the state is only expressly prohibited from the use of silence "at the time of arrest and after receiving *Miranda* warnings." *Doyle*, 426 U.S. at 619, 96 S.Ct. 2240.

■ Here, there is no showing that Defendant's silence was in any way related to receiving his *Miranda* warnings. In fact, there is no evidence in the record that he received *Miranda* warnings. Instead, the Prosecutor asked broad questions, which were not confined to Defendant's post-arrest silence but addressed Defendant's failure to tell his story during the six years following the murder. *See State v. Etherton*, 779 S.W.2d 12 (Mo.App. E.D. 1989). Therefore, the fault lies not with the Prosecutor's questions, but rather with Defendant's answers.

Moreover, the Prosecutor's questions were not restricted to what Defendant told state officials, but encompassed whether Defendant had told anyone his story of self-defense. In fact, the Prosecutor's questions merely suggested that Defendant's explanation for shooting Victim was a recent fabrication because he failed to previously mention his self-defense explanation to anyone.

Furthermore, Defendant's allegation of error, that the Prosecutor improperly commented on his post-arrest silence, misstates the facts of this case. Although Defendant is correct that he was under no obligation to "tell his story" to anyone between the time of his arrest and trial, he chose to tell numerous individuals, including his mother and the police, that he did not murder Victim. In doing so, he voluntarily spoke out that he did not kill Victim, and the Prosecutor properly questioned the inconsistencies between his previous statement of noninvolvement in Victim's murder and the self-defense claim he pre-

sented on retrial. Defendant was under no duty to speak, but having spoken, he enjoys no license to lie. As such, we find no manifest injustice. Point three is denied.

## IV. The Pre–Assignment Judge's Comments to the Jury Pool

■ Defendant's final point on appeal claims that the trial court erred in refusing to quash the jury panel based upon the pre-assignment judge's comments indicating that Defendant was previously tried for Victim's murder. The language Defendant complains about is the pre-assignment judge's statement to the jury pool in the jury assembly room that "there is one case that will probably last a week. And when it had been tried before, it was a two week case, I don't think it would be that long this time." Defendant argues the judge's comments tainted jurors, who would have realized the first trial resulted in a conviction given that the retrial did not occur for four years.

■ Missouri law vests broad discretion with the trial court in determining whether a venire panel should be dismissed. *State v. Lacy*, 851 S.W.2d 623, 631 (Mo.App. E.D.1993). Moreover, the trial court has discretion to determine how statements before the panel will affect the members, and what action to take to assure that a defendant receives a fair trial. *State v. Eley*, 715 S.W.2d 16, 17 (Mo.App. E.D.1986). A trial court's decision not to quash a jury panel will not be disturbed absent an abuse of discretion. *State v. Davis*, 806 S.W.2d 441, 443 (Mo.App. E.D. 1991), *citing State v. Wilson*, 615 S.W.2d 571, 574 (Mo.App. W.D.1981).

Although the trial court overruled Defendant's motion to quash, it began voir dire by asking, "Is there anyone on the venire panel who has any knowledge or has heard anything about this case either from the newspaper, radio, television, *or from any other source,* including other people, *at any time, including today?* "

(Emphasis added.) Of the venirepersons questioned, only four mentioned that they were aware that the case was on retrial, and three of the four were struck from the panel.

Venireperson Pea, the one individual who had knowledge that the case was on retrial and sat on the jury, testified: (1) he recalled someone in the morning may have mentioned that one case lasted two weeks last time, and that the case was being retried; (2) he had not drawn any conclusions and had not been speculating since hearing the judge's comments; (3) he was not certain whether the pre-assignment judge was referring to the Santillan case; (4) there was nothing that would impact his ability to be fair; (5) he had not drawn any conclusions or formed any opinions about the case; (6) he did not have an opinion as Defendant's guilt; and (7) he was a clean slate and able to decide the case from only the evidence presented and the law given by the trial court.

The trial court did not abuse its discretion by denying Defendant's motion to quash the jury panel and failing to continue the case. The trial judge asked questions on voir dire designed to determine the effect of the pre-assignment judge's previous comments on potential jurors, struck from the panel three of the four venirepersons who mentioned that they believed the case was being retried, and elicited sufficient information from the remaining venireperson, Mr. Pea, to establish that he could be fair and impartial. Point four is denied.

The judgment is affirmed.

SIMON, P.J., and RICHARD B. TEITELMAN, J., concur.