

# In the Missouri Court of Appeals
# Eastern District

### DIVISION TWO

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED110330 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Charles County |
| vs. | ) | |
| | ) | Honorable Michael J. Fagras |
| JOSHUA O'KEEFE, | ) | |
| | ) | |
| Appellant. | ) | FILED: October 24, 2023 |

### Introduction

Joshua O'Keefe ("O'Keefe") appeals from the trial court's judgment following a jury conviction on first-degree manslaughter arising out of a road-rage incident. O'Keefe raises eight points on appeal. O'Keefe first argues the trial court plainly erred in refusing to instruct the jury on defense of others, in addition to self-defense, because substantial evidence showed O'Keefe reasonably believed that using physical force was necessary to protect his family, who were passengers in his vehicle. O'Keefe likewise contends the trial court abused its discretion in sustaining the State's objections to his statements in closing argument that he acted in defense of others. O'Keefe further claims the trial court erred when it incorrectly instructed the jury on self-defense by including the term "deadly force" because pushing or punching Victim did not amount to "deadly force" and by omitting from the instruction that O'Keefe was permitted to defend against Victim's forcible felony. In three related points, O'Keefe maintains the trial court

abused its discretion in excluding evidence of Victim's inhalant use because the evidence was relevant to causation, to whether Victim was the initial aggressor, and to whether O'Keefe reasonably believed that he needed to defend himself against Victim. Lastly, O'Keefe asserts the trial court plainly erred in allowing the State to mention in closing argument that O'Keefe did not raise a self-defense argument until the time of trial.

Because the record does not contain substantial evidence from which O'Keefe reasonably could believe his family was in immediate danger of death or serious harm at the time he used force against Victim, the trial court did not plainly err in declining to instruct the jury on defense of others, and we deny Point One. Similarly, the trial court did not err in precluding O'Keefe from raising the issue of defense-of-others during closing argument, and we deny Point Two. With regard to O'Keefe's two claims of instructional error, the trial court did not err in including "deadly force" in the self-defense instruction because the use of deadly force was a disputed issue of fact for the jury to decide, and we deny Point Three. Because the record did not show that O'Keefe reasonably believed Victim posed an ongoing or imminent threat of committing a forcible felony when O'Keefe used physical force against Victim, the trial court correctly intructed the jury on self-defense, and we deny Point Eight. O'Keefe's evidentiary claims relate to Victim's alleged use of inhalants. The trial court did not err in excluding evidence of Victim's inhalant use because O'Keefe's offer of proof did not sufficiently support a finding that Victim was under the influence of an inhalant at the time of the incident, thus we deny Points Four, Five, and Six. Finally, because the State's closing argument did not improperly comment on O'Keefe's exercise of his constitutional right to remain silent following his arrest, the trial court did not plainly err in not sua sponte limiting the State's argument, and we deny Point Seven. Accordingly, we affirm the trial court's judgment.

2

## Factual and Procedural History

This case stems from an incident occurring on westbound Interstate 64 in St. Charles on August 30, 2020. O'Keefe was driving a pickup truck with his Wife and Children (collectively, "Family") as passengers and was pulling a trailer. Victim was also driving a pickup truck westbound, and he became angry when a rock may have fallen off O'Keefe's trailer and hit his windshield. Victim was not staying in his lane and twice "brake-checked" O'Keefe by pulling in front of his truck at a high speed, then slowing down and driving close without hitting him.

O'Keefe and Victim pulled their trucks over to the shoulder. Victim stopped his truck in front of O'Keefe's truck. Both men were angry. Victim exited his truck and stood on the driver's side. Victim was unarmed and did not make any threatening gestures. O'Keefe exited his truck and quickly approached Victim and struck him. According to numerous eyewitnesses, O'Keefe punched Victim in the face. The punch was very strong—"a very swift hard hit with one arm" and a "very hard punch." One witness described the punch as "the hardest [he had] ever seen anybody hit." Victim was sixty-eight years old and weighed 135 pounds. Additional witnesses observed O'Keefe forcefully pushing or punching Victim against the truck. Victim fell to the ground immediately, "like a rag doll," and lost consciousness. O'Keefe then picked up Victim and put him inside the truck. Witnesses called 911.

Victim died from his injuries. Specifically, Victim died from the injuries to his brain from a skull fracture. Victim had bruising around the right eye and a broken nose, consistent with being punched in the face. Victim had no injuries on his hands. Victim's injuries resulting from the severe impact of his head to the ground were worse than if he had simply fallen.

After the incident, O'Keefe used a different cell phone to communicate with Wife, and Wife searched the internet for information regarding the incident. Accompanied by an attorney, O'Keefe turned himself in to police on September 2, 2020. The State charged O'Keefe with

second-degree murder or, alternatively, first-degree involuntary manslaughter for the death of Victim. The State alleged O'Keefe struck Victim, causing Victim's head to impact a hard surface.

Prior to trial, the State filed a motion in limine to exclude evidence that Victim was under the influence of toluene from glue-sniffing at the time of the incident. The trial court held the issue until after the State's evidence, finding after hearing the parties' arguments that the evidence of Victim's inhalant use was too speculative without accompanying expert testimony.

The case proceeded to trial in October 2021. O'Keefe testified that Victim was screaming, belligerent, and intoxicated when exiting his truck. O'Keefe admitted he pushed Victim but denied that he punched Victim. O'Keefe testified that after he pushed Victim, whom O'Keefe alleged pushed him first, Victim fell down and hit his head. O'Keefe stated that Victim lost consciousness as O'Keefe was helping him into his truck. O'Keefe's Wife and Children also testified in his defense, recounting that they were scared and crying due to Victim's driving.

At the close of the State's evidence, O'Keefe made an offer of proof regarding Victim's inhalant use. O'Keefe called S.M., a forensic microbiologist from the St. Louis University forensic toxicology lab. S.M. testified about Victim's toxicology reports and opined that while the results showed evidence of recent inhalant use, the results were inconclusive as to whether Victim was under the influence from toluene at the time of the incident. S.M. testified that Victim's conduct during the incident was inconsistent with a person under the influence of toluene. A Missouri State Highway Patrol Trooper (the "Trooper") investigated the incident and heard evidence from Victim's family members about Victim's alleged chronic inhalant abuse, including that Victim's son ("Son") found one open and three closed packages of glue in Victim's truck. The Trooper, a certified Drug Recognition Expert ("DRE"), also testified that

4

Victim's conduct during the incident was inconsistent with a person under the influence of an inhalant.

The trial court held a jury instruction conference. O'Keefe orally proposed that the jury be instructed on defense of others but did not submit a written defense-of-others instruction.[1] The trial court instructed the jury on self-defense as follows:

> One of the issues is whether the use of physical force by [O'Keefe] against [Victim] was lawful. On the issue of self-defense you are instructed as follows:
>
> In this state the use of physical force, including the use of deadly force, to defend oneself is lawful in certain situations. However, an initial aggressor is not justified in using physical force to defend himself from the counter attack that he provoked. In order for a person lawfully to use non-deadly physical force in self-defense he must reasonably believe such physical force is necessary to defend himself from what he reasonably believes to be the use or imminent use of unlawful force and he can only use physical force to the extent that he reasonably believes is necessary to defend himself.
>
> But a person is not permitted to use deadly force unless he reasonably believes that the use of deadly force is necessary to protect himself against death or serious physical injury.
>
> A person is not required to retreat before resorting to the use of physical force if he is remaining in a location the person has the right to be. The state has the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense. Unless you find beyond a reasonable doubt that the defendant did not act in lawful self-defense, you must find the defendant not guilty.
>
> As used in this instruction, an "initial aggressor" is one who first attacks or threatens to attack another.
>
> As used in this instruction, the term "reasonably believe" means a belief based on reasonable grounds, that is, grounds that could lead a reasonable person in the same situation to the same belief. This depends upon how the facts reasonably appeared. It does not depend upon whether the belief turned out to be true or false.

---

[1] The parties disputed whether O'Keefe submitted a proposed defense-of-others instruction in writing, and we directed the trial court to conduct an inquiry. Following a hearing on the record, the trial court found that although the issue of defense-of-others was raised during the jury instruction conference, O'Keefe did not submit a written instruction to the trial court.

As used in this instruction, "deadly force" means physical force which is used with the purpose of causing or which a person knows to create a substantial risk of causing death or serious physical injury.

As used in this instruction, the term "serious physical injury" means physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body.

("Self-Defense Instruction"). O'Keefe objected to the Self-Defense Instruction, arguing that it should not include deadly-force language and, if it did, the instruction should also include language that deadly force could be used to defend against not only death or serious physical injury but also against the commission of a forcible felony. O'Keefe alleged Victim had committed a forcible felony in the manner he was driving his truck. The State argued that whatever had happened while the men were driving their trucks on the highway had concluded by the time O'Keefe punched Victim. The trial court overruled O'Keefe's objections and submitted the Self-Defense Instruction as set forth above.

During closing argument, O'Keefe twice stated that he was acting in defense of his Family. Specifically, he argued the case was "defense of others" and that his "intention in that push [against Victim] was to defend himself and his family." The State objected to both instances, and the trial court sustained the objections. After the second occurrence, the trial court instructed the jury to disregard the statement. During the State's rebuttal closing argument, the State commented:

This claim that it was only a push and not a punch is contradicted by four people who independently saw it and were phoning 911 within seconds of it occurring. You know, to hear what they [O'Keefe and Wife] had to say, you don't have to wait a year and hunt him down. [O'Keefe and his wife's] story, you don't hear for a year after the fact. They [the eyewitnesses] were on the phone within seconds after this happened. And that gives them [the eyewitnesses] immeasurable credibility compared to him.

The State also commented:

[O'Keefe's] children's testimony actually, in and of itself, dooms him because when you listen to what they[] say it wasn't self-defense and it is not anywhere near what [O'Keefe] and his wife had come up with after they've had over a year to rehearse. And [the defense] had the opportunity to hear every single witness and read all the police reports.

O'Keefe raised no objection.

The jury found O'Keefe guilty of first-degree manslaughter. The trial court sentenced O'Keefe to fifteen years in prison. O'Keefe moved for a new trial, which the trial court denied. O'Keefe now appeals.

Points on Appeal

O'Keefe raises eight points on appeal. Point One contends the trial court plainly erred in refusing his instruction for defense of others because substantial evidence showed O'Keefe reasonably believed that using physical force was necessary to protect his Family from Victim. Point Two maintains the trial court abused its discretion in sustaining the State's objection to O'Keefe's closing argument that he acted in defense of others because the evidence showed O'Keefe acted to protect his Family. Point Three argues the trial court erred by including "deadly force" in the Self-Defense Instruction because pushing or punching someone is not "deadly force" such that the instruction confused the jury and made it more probable the jury would find he did not act in self-defense. Point Four asserts the trial court abused its discretion in sustaining the State's objection to evidence of Victim's inhalant use because the evidence was relevant to causation in that Victim's inhalant-impaired state could have contributed to him falling and sustaining his fatal head injury. Point Five posits the trial court abused its discretion in sustaining the State's objection to evidence of Victim's inhalant use because it was relevant to whether Victim was the initial aggressor. Point Six contends the trial court abused its discretion in sustaining the State's objection to evidence of Victim's inhalant use because it was relevant to whether O'Keefe reasonably believed he needed to defend himself against Victim. Point Seven

argues the trial court plainly erred in allowing the State to argue in closing that O'Keefe waited until trial, a year after he was arrested, to assert that he acted in self-defense because it made improper reference to his right to remain silent, implying that O'Keefe fabricated his self-defense claim. Point Eight maintains the trial court erred or plainly erred in failing to specify in the Self-Defense Instruction that using deadly force was permissible to defend against Victim's forcible felony because there was evidence that Victim committed second-degree assault against O'Keefe while Victim was driving his truck.

Discussion

**I.      Points One, Two, Three, and Eight—Self-Defense**

       A.     <u>Point One—Defense-of-Others Jury Instruction</u>

            **1.     Standard of Review**

In order to preserve a claim that the trial court erred in refusing to give a requested jury instruction, a defendant must submit the proposed instruction in writing. <u>See</u> Rule 28.02(b)[2] (stating "counsel shall submit to the court instructions and verdict forms that the party requests to be given[;] [i]nstructions and verdict forms that a party requests shall be submitted in writing"). Because the trial court determined that O'Keefe did not proffer a written defense-of-others jury instruction as required by Rule 28.02, the claim that the trial court should have given the instruction is unpreserved for appellate review. <u>See</u> <u>id.</u>; <u>State v. Derenzy</u>, 89 S.W.3d 472, 475 (Mo. banc 2002) (internal citation omitted) (noting a party's failure to submit a correct instruction renders a claim of error unpreserved).

O'Keefe requests we exercise our discretion to review the point for plain error. "Rule 30.20 is the exclusive means by which an appellant can seek review of any unpreserved claim of

---

[2] All Rule references are to Mo. R. Crim. P. (2021).

error[.]" State v. Minor, 648 S.W.3d 721, 731 (Mo. banc 2022) (quoting State v. Brandolese, 601 S.W.3d 519, 530 (Mo. banc 2020)).  We conduct plain-error review in two steps.  We first determine "whether the claim of error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted."  Id. (quoting Grado v. State, 559 S.W.3d 888, 899 (Mo. banc 2018)).  Plain errors are those that are "evident, obvious, and clear." Id. (quoting Grado, 559 S.W.3d at 899).  Then, if we find plain error, we must determine "whether the claimed error resulted in [either] manifest injustice or a miscarriage of justice."  Id. (quoting Grado, 559 S.W.3d at 900).

"Instructional error seldom constitutes plain error."  State v. Myles, 479 S.W.3d 649, 655 (Mo. App. E.D. 2015) (internal citation omitted); see also State v. Rost, 429 S.W.3d 444, 450 (Mo. App. S.D. 2014) (internal quotation omitted) (noting instructional error rarely rises to plain error because "[i]f a defect is not readily apparent to alert counsel preparing to argue the case, there is very little likelihood that the jury will be confused or misled").  "To show that the trial court plainly erred in submitting a jury instruction, a defendant must go beyond a demonstration of mere prejudice."  Myles, 479 S.W.3d. at 655 (internal citation omitted).  "In the realm of instructional error, plain error exists when it is clear that the trial court has so misdirected or failed to instruct the jury that manifest injustice or miscarriage of justice has resulted."  State v. Kendrick, 550 S.W.3d 117, 121 (Mo. App. W.D. 2018) (quoting State v. Hunt, 451 S.W.3d 251, 260 (Mo. banc 2014)).  An instructional error rises to the level of reversible plain error "only if it is apparent that the jury's verdict was tainted by the instructional error."  Myles, 479 S.W.3d at 656 (internal quotation omitted).

However, we review questions of law de novo, including whether a justification defense has been raised by the evidence.  State v. Caldwell, 655 S.W.3d 374, 378 (Mo. App. W.D. 2021)

9

(internal quotation omitted).  Even under plain error, we view the evidence in the light most favorable to giving the defendant's self-defense instruction.  Kendrick, 550 S.W.3d at 121 (quoting State v. Bruner, 541 S.W.3d 529, 534 (Mo. banc 2018)).

### 2.    Analysis

Section 563.031[3] governs the justification of defense of others.  The defendant has the burden of injecting the issue into the case.  Section 563.031.5; Kendrick, 550 S.W.3d at 122.  A trial court must give a defense-of-others instruction "when substantial evidence is adduced to support it."  Caldwell, 655 S.W.3d at 378 (internal quotation omitted); State v. Endicott, 600 S.W.3d 818, 823 (Mo. App. E.D. 2020) (internal citation omitted); Kendrick, 550 S.W.3d at 122 (quoting Bruner, 541 S.W.3d at 534) ("The quantum of proof required to inject the issue of self-defense has been described by our Supreme Court as 'substantial evidence.'").  "[S]ubstantial evidence of self-defense requiring instruction may come from the defendant's testimony alone as long as the testimony contains some evidence tending to show that he acted in self-defense."  Kendrick, 550 S.W.3d at 122 (quoting Bruner, 541 S.W.3d at 534).

"As the Missouri Supreme Court has explained, the 'defense-of-others' justification defense is an 'extension of the self-defense justification, in that the actor may do in another's defense anything the person himself may have lawfully done in the circumstances.'"  Caldwell, 655 S.W.3d at 378 (quoting State v. Bolden, 371 S.W.3d 802, 805 (Mo. banc 2012)).  Section 563.031 provides in relevant part:

> 1.  A person may, subject to the provisions of subsection 2 of this section, use physical force upon another person when and to the extent he or she reasonably believes such force to be necessary to defend himself or herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful force by such other person. . . .
> . . .

---

[3] All Rule references are to RSMo (2016), unless otherwise noted.

> 2. A person shall not use deadly force upon another person under the circumstances specified in subsection 1 of this section unless:
> (1) He or she reasonably believes that such deadly force is necessary to protect himself, or herself or her unborn child, or another against death, serious physical injury, or any forcible felony . . . .

Section 563.031.1–2; Caldwell, 655 S.W.3d at 378. Critically, "[t]he use of deadly force [in the defense of another] is justified only when the defender reasonably believes deadly force is necessary to protect . . . another [person] from immediate danger of death or serious bodily harm." Id. (quoting State v. Whipple, 501 S.W.3d 507, 517 (Mo. App. E.D. 2016)). "Reasonable belief means 'a belief based on reasonable grounds, that is, grounds that could lead a reasonable person in the same situation to the same belief.'" Id. (quoting Whipple, 501 S.W.3d at 517). "A defender is not entitled to use 'more force than he reasonably believes necessary to prevent harm to the defended person,' and the force used 'may not exceed that which the defended person would be justified in using.'" Id. (internal quotation omitted).

Here, the trial court instructed the jury on self-defense but did not instruct on defense of others. Because O'Keefe did not submit a written instruction, this Court cannot know what O'Keefe intended to put in his defense-of-others instruction, which severely impairs our review even under the plain-error standard. Nevertheless, we consider whether the record contained substantial evidence to support O'Keefe's claim that he possessed a reasonable belief that deadly force was necessary to protect his Family from Victim's imminent use of force at the time he physically confronted Victim. See Endicott, 600 S.W.3d at 824.

O'Keefe argues the record contained substantial evidence supporting a defense-of-others instruction based on Victim's driving, specifically that Victim was trying to run O'Keefe and his Family off the road. O'Keefe testified that after the two men pulled their trucks over to the

11

shoulder, Victim exited his truck appearing belligerent, "red in the face," and screaming unintelligibly. O'Keefe testified that Victim pushed him first.

Even viewing the evidence in the light most favorable to O'Keefe, the record lacks substantial evidence that O'Keefe reasonably believed his Family was in immediate danger of death or serious bodily harm at the time of the physical altercation. See Caldwell, 655 S.W.3d at 379. O'Keefe focuses on the evidence that he and his Family feared for their lives while Victim was driving. Critically, however, at the time O'Keefe used force against Victim, Victim was no longer driving or behind the wheel of his truck, but instead was standing beside his vehicle. Given these facts, Victim could not have posed an ongoing or imminent threat to the Family by means of driving. Compare Caldwell, 655 S.W.3d at 379–80 (finding no evidence for a defense-of-others instruction where the person the defendant shot at may have been approaching a group containing the defendant's mother with the intention to elevate a verbal altercation to a fistfight but was unarmed and not actually engaged in an assault against the defendant's mother when the defendant retrieved and discharged his firearm) with Endicott, 600 S.W.3d at 824 (finding evidence for a defense-of-others instruction where the victim was pointing his gun at the defendant while the defendant was standing directly in front of his friend such that his friend was in the line of fire and likely would have been hit as well). The record lacks any evidence that Victim approached or threatened the passengers in O'Keefe's truck after Victim and O'Keefe pulled onto the shoulder of the highway and got out of their trucks. Rather, the record shows that Victim was unarmed and standing beside his truck when O'Keefe approached him. Such facts do not constitute substantial evidence establishing either a reasonable fear of imminent harm to Victim's Family or a reasonable belief that deadly force was necessary to defend O'Keefe's Family. See Caldwell, 655 S.W.3d at 379. Further, even accepting O'Keefe's testimony that

12

Victim was screaming at O'Keefe or pushed O'Keefe first, such conduct was directed against O'Keefe and not against his Family, thereby supporting the trial court's instructing the jury on self-defense rather than defense of others. See id. Accordingly, the trial court did not plainly err in not instructing the jury on defense of others. See Kendrick, 550 S.W.3d at 121 (quoting Hunt, 451 S.W.3d at 260). Point One is denied.

### B. Point Two—Exclusion of Defense-of-Others Statements in Closing Argument

#### 1. Standard of Review

"The trial court is in the best position to appraise the consequence of a closing argument, and has broad discretion to determine if the particular line of argument is proper." State v. Lockett, 165 S.W.3d 199, 206 (Mo. App. E.D. 2005) (internal citation omitted). We thus review preserved claims of error in closing argument for an abuse of discretion. State v. Swalve, 598 S.W.3d 682, 689 (Mo. App. E.D. 2020) (internal citations omitted). "An abuse of discretion occurs when a defendant is prejudiced such that 'there is a reasonable probability that the outcome at trial would have been different if the error had not been committed.'" Id. (quoting State v. Holmsley, 554 S.W.3d 406, 410 (Mo. banc 2018)).

#### 2. Analysis

Parties have wide latitude in closing arguments but may not argue outside the law or facts in evidence presented at trial. Id. (citing State v. Walter, 479 S.W.3d 118, 125 (Mo. banc 2016)). Indeed, "the permissible field of argument is broad . . . so long as counsel does not go beyond the evidence and issues drawn by the instructions or urge prejudicial matters or a claim or defense which the evidence and issues drawn by the instructions do not justify[.]" Lockett, 165 S.W.3d at 206 (internal citation omitted). "Although courts are to be careful to refrain from unduly restricting closing arguments, they have the power to confine the arguments to issues raised by

13

the pleadings and the evidence." State v. Perkins, 656 S.W.3d 285, 299 (Mo. App. E.D. 2022) (quoting State v. Barton, 936 S.W.2d 781, 783 (Mo. banc 1996)). Additionally, the trial court must consider the propriety of closing argument statements not in isolation but in light of the entire record. Swalve, 598 S.W.3d at 689 (internal quotation omitted).

Here, O'Keefe asserts the trial court erred in precluding him from arguing that he lawfully acted in defense of others, because, as discussed in Point One, O'Keefe maintains his defense-of-others claim was supported by the evidence. See Perkins, 656 S.W.3d at 299. However, we determined in the preceding discussion that no substantial evidence supported giving a defense-of-others instruction. That finding is dispositive of this point because no closing argument about defense of others could be permissibly drawn from the facts in evidence or from the jury instructions. See Swalve, 598 S.W.3d at 690 (quoting Walter, 479 S.W.3d at 125) ("'The latitude given to parties in closing does not serve as an end run around the law of evidence,' but rather, '[c]losing argument grants each side the opportunity to highlight the evidence that was presented.'"). The trial court did not abuse its discretion in sustaining the closing-argument objections. See id. at 689 (internal citations omitted). Point Two is denied.

        C.      Points Three and Eight—Deadly Force in the Self-Defense Instruction

        **1.      Standard of Review**

Preliminarily, the State suggests we should review these instructional-error claims only for plain error because O'Keefe did not submit a written alternative self-defense instruction with the requested modifications to the trial court. As set forth in the preceding discussion, failure to proffer a jury instruction in writing as required by Rule 28.02 does not preserve an instructional-error claim for appellate review. See Rule 28.02(b); Derenzy, 89 S.W.3d at 475. Although O'Keefe timely objected to the Self-Defense Instruction during the jury instruction conference

14

and reprised his objections in his motion for new trial, we may only conduct plain-error review because he did not comply with Rule 28.02. As set forth above, "plain error exists when it is clear that the trial court has so misdirected or failed to instruct the jury that manifest injustice or miscarriage of justice has resulted." Kendrick, 550 S.W.3d at 121 (quoting Hunt, 451 S.W.3d at 260). Nevertheless, where instructional-error claims present questions of law, our review is de novo. Caldwell, 655 S.W.3d at 378 (internal quotation omitted).

**2.      Analysis**

Missouri Approved Instructions–Criminal ("MAI-CR") 4th 406.06 requires the trial court to instruct the jury on the use of deadly force in a self-defense instruction when there is evidence in the record that the defendant used deadly force. In contrast, if the record contains no evidence as to the use of deadly force by the defendant, then that subsection of the self-defense instruction will not be used. See MAI-CR 4th 406.06 Notes on Use 7. Section 563.011 defines "deadly force" as "physical force which the actor uses with the purpose of causing or which he or she knows to create a substantial risk of causing death or serious physical injury[.]" Section 563.011(2), RSMo (Cum. Supp. 2018). "[W]hether deadly force was used depends not only on the amount of force used but also on the defendant's purpose to cause, or awareness of the likelihood of causing, death or serious physical injury." State v. Seals, 487 S.W.3d 18, 24 (Mo. App. S.D. 2016) (quoting State v. Westfall, 75 S.W.3d 278, 282 (Mo. banc 2002)). Most important to the question before us, "[t]he issue of deadly force is a factual one which should be decided by a properly instructed jury." Id. (citing Westfall, 74 S.W.3d at 282–83).

When the parties dispute whether deadly force or non-deadly force was used, and there is evidence making it a factual issue for the jury to decide, a trial court must instruct the jury on

both deadly force and non-deadly force.  See Westfall, 74 S.W.3d at 281; Rost, 429 S.W.3d at 450–51; MAI-CR 4th 406.05 Notes on Use 7.

Here, O'Keefe posits that the evidence at trial did not support instructing the jury on the use of "deadly force" in the Self-Defense Instruction.  The trial court instructed the jury on both deadly force and non-deadly force, properly defining deadly force to the jury as "physical force which is used with the purpose of causing or which a person knows to create a substantial risk of causing death or serious physical injury."  Viewed in the light most favorable to O'Keefe as required for reviewing self-defense instructions, there was some evidence to support O'Keefe's claim that he used non-deadly force when he used physical force against Victim.  See Rost, 429 S.W.3d at 450–51.  Specifically, O'Keefe testified that he only pushed Victim, and he argued that Victim's injures and death resulted from falling and hitting his head, rather than from O'Keefe punching him.  O'Keefe accurately notes that even if he had punched Victim, punching someone does not automatically, as a matter of law, constitute deadly force so as to remove the question of the use of force from the jury.  See State v. Miller, 91 S.W.3d 630, 634 (Mo. App. W.D. 2002) (citing Westfall, 75 S.W.3d at 282) (noting it is for the jury to determine whether the defendant's conduct showed he had the purpose to cause or the awareness of the likelihood to cause death or serious physical injury).  In Miller, the defendant was charged and convicted with first-degree assault for using his fists to hit the victim, who struck his head on a van when he was knocked down, resulting in a severe head injury, including a skull fracture.  Id. at 632.  Rather than instructing on the use of both deadly and non-deadly force in order for the jury to determine whether the defendant could have reasonably anticipated the seriousness of the victim's injuries, the trial court in Miller erroneously decided the defendant used deadly force as a matter of law. Id. at 634–35.  Although O'Keefe attempts to rely on Miller to show instructional error, Miller

16

illustrates the trial court correctly instructed the jury to decide the factual issue of his use of force against Victim. See id.

O'Keefe argues the evidence at trial showed that his use of force against Victim could not have amounted to deadly force. O'Keefe overlooks the fact that given the force and severity of the touching, a punch may, in some circumstances, cause death or serious physical injury. See State v. Hall, 561 S.W.3d 449, 453 (Mo. App. S.D. 2018) (internal quotation omitted) (noting "Missouri courts have recognized that beating with fists can cause death or serious physical injury"); see also State v. Fears, 803 S.W.2d 605, 608 (Mo. banc 1991) (upholding a conviction on voluntary manslaughter where sufficient evidence showed the defendant proximately caused the victim's death by hitting the victim with his fist, thereby causing the victim to fall and die from a skull fracture); State v. Burch, 939 S.W.2d 525, 530 (Mo. App. W.D. 1997) (finding an elbow qualified as a dangerous instrument because "[f]ists can be a force likely to produce death or great bodily harm"); MAI-CR 4th 406.05 Notes on Use 7 (explaining that whether the use of force was deadly may depend on whether death or serious injury resulted). While the jury could have determined O'Keefe did ***not*** knowingly create a risk of substantial serious physical injury or death by punching Victim, there was sufficient evidence from which to instruct otherwise. Countering O'Keefe's characterization of his encounter with Victim, the record contains substantial evidence that O'Keefe did use deadly force against Victim. See Rost, 429 S.W.3d at 450–51. First and foremost, Victim died after O'Keefe punched him so hard that he hit the ground with sufficient force to facture his skull. Numerous third-party witnesses having no connection to either Victim or O'Keefe described O'Keefe's use of force against Victim with sufficient indications of deadly force: "a very hard punch," "a very swift hard hit with one arm," and "the hardest [he had] ever seen anybody hit." Expert medical testimony as to the injuries

17

Victim suffered also supported instructing on deadly force: bruising around the right eye and a broken nose consistent with being punched in the face once or more times, abrasions and contusions on his back, injuries to his forehead, back of the head, and elbow, and, when the punch knocked him down, the severe impact with the ground fracturing the left side of his skull and killing him. Considering the evidence in the record, including that Victim was sixty-eight years old and weighed only 135 pounds, and that striking him could result in him falling and hitting his head on the pavement, the severity of the force O'Keefe used against Victim permitted a reasonable inference that O'Keefe either had the purpose to cause or knowingly created a substantial risk of causing death or serious physical injury, and his use of physical force was the proximate cause of Victim's death. See Seals, 487 S.W.3d at 24 (quoting Westfall, 75 S.W.3d at 282); see also State v. Summers, 653 S.W.3d 155, 166–67 (Mo. App. W.D. 2022) (finding sufficient evidence that a defendant's reckless conduct proximately caused a broken wrist, a serious physical injury, "insofar as it is reasonably foreseeable that suddenly pulling away from a person's grasp could cause the person to fall and that a person who unexpectedly falls onto a concrete surface will sustain injury, potentially including a broken bone"). Therefore, because the level of force was a disputed factual question, the trial court did not err, plainly or otherwise, in instructing the jury on both deadly force and non-deadly force. See Rost, 429 S.W.3d at 450–51; Miller, 91 S.W.3d at 634 (internal quotation omitted); MAI-CR 4th 406.05 Notes on Use 7. Point Three is denied.

In Point Eight, O'Keefe further challenges the Self-Defense Instruction because the trial court omitted language from the intruction that O'Keefe was permitted to use deadly force to defend against Victim's commission of a forcible felony. Specifically, O'Keefe alleges Victim committed second-degree assault against O'Keefe while Victim was driving his truck.

18

The self-defense statute "justif[ies] the use of deadly force only if the defending person reasonably believes that death, serious physical injury, or a forcible felony *is actually occurring or is imminent."* State v. Sinks, 652 S.W.3d 322, 338 (Mo. App. E.D. 2022) (citing State v. Clinch, 335 S.W.3d 579, 586–87 (Mo. App. W.D. 2011)). "To justify the use of deadly force, '[s]ome affirmative action, gesture, or communication by the person feared indicating the immediacy of danger, the inability to avoid or avert it, and the necessity to use deadly force as a last resort must be present.'" Id. at 338–39 (quoting State v. Akins, 643 S.W.3d 923, 925 (Mo. App. E.D. 2022)).

Here, the State reasons that there was a clear and definitive break between what happened when Victim and O'Keefe were driving on the highway and what happened after O'Keefe pulled onto the side of the highway behind Victim and got out of his truck. We agree. Even assuming arguendo that Victim's dangerous driving and brake-checking rose to the level of felony assault, that assault was not occurring or imminent after Victim and O'Keefe pulled to the side of the highway and stopped their trucks. See id. at 338 (citing Clinch, 335 S.W.3d at 586–87). Victim was no longer driving his truck. Victim got out and stood next to his truck, with O'Keefe having pulled over behind him. Given these undisputed facts, there was no longer an immediacy of danger that Victim could imminently assault O'Keefe with his truck. See id. (quoting Akins, 643 S.W.3d at 925). Under the light most favorable to O'Keefe's claim, at the time O'Keefe employed deadly force, Victim may have been belligerent and yelling but was unarmed and standing *next to his truck*. The evidence thus does not support a finding that O'Keefe reasonably could believe he was in imminent danger of Victim assaulting him again with his truck at the time he used deadly force. See Kendrick, 550 S.W.3d at 124 (internal citation omitted). The trial court therefore did not err, plainly or otherwise, in declining to include

19

forcible-felony language in the Self-Defense Instruction. See Caldwell, 655 S.W.3d at 378 (internal quotation omitted). Point Eight is denied.

## II. Points Four, Five, and Six—Evidence of Victim's Inhalant-Use

In Points Four, Five, and Six, O'Keefe challenges the trial court's exclusion of evidence relating to Victim's inhalant use following an offer of proof. Specifically, O'Keefe reasons the evidence was relevant to (1) causation in that Victim's inhalant-impaired state could have contributed to him falling and sustaining his fatal head injury (Point Four); (2) whether Victim was the initial aggressor (Point Five); and (3) whether O'Keefe reasonably believed he needed to defend himself against Victim (Point Six).

### A. Standard of Review

For reviewing evidentiary claims "[o]n appeal from a jury-tried case, we view the facts in the light most favorable to the jury's verdict." State v. Townsend, 649 S.W.3d 72, 77 (Mo. App. E.D. 2022) (internal citation omitted). "'A trial court has broad discretion to admit or exclude evidence,' and its decision will be reversed only for a clear abuse of discretion." State v. Culpepper, 505 S.W.3d 819, 828 (Mo. App. S.D. 2016) (quoting State v. Forrest, 183 S.W.3d 218, 223 (Mo. banc 2006)). "A trial court abuses its discretion when its ruling is 'clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.'" Townsend, 649 S.W.3d at 77–78 (internal quotation omitted).

"Evidentiary error is reviewed 'for prejudice, not mere error' and error is only prejudicial if [it] affected the outcome of the trial with 'reasonable probability' and deprived the defendant of a fair trial." State v. Taylor, 466 S.W.3d 521, 528 (Mo. banc 2015) (internal quotation omitted). "[I]f reasonable persons can differ about the propriety of the action taken by the trial

20

court, then it cannot be said that the trial court abused its discretion." Sinks, 652 S.W.3d at 346 (quoting Brandolese, 601 S.W.3d at 533).

B. Analysis

In order to be admissible, evidence must be both logically and legally relevant. State v. Blurton, 484 S.W.3d 758, 778 (Mo. banc 2016) (citing Taylor, 466 S.W.3d at 528); State v. Anderson, 306 S.W.3d 529, 538 (Mo. banc 2010) (internal citation omitted). "Evidence is logically relevant if it tends to make the existence of a material fact more or less probable." Taylor, 466 S.W.3d at 528 (internal quotation omitted). "Evidence is legally relevant when the probative value of the evidence outweighs 'unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness.'" Id. (internal quotation omitted). A trial court properly excludes logically relevant evidence if its prejudice outweighs its probative value. Anderson, 306 S.W.3d at 538 (internal citation omitted).

For evidence of Victim's inhalant use to be logically relevant on any of the grounds O'Keefe identifies on appeal, O'Keefe needed to show in his offer of proof that Victim was under the influence of toluene from glue-sniffing *at the time of the incident.* See Harris v. Jungerman, 560 S.W.3d 549, 561–62 (Mo. App. W.D. 2018) (finding evidence that the petitioner had used methamphetamines and marijuana two days prior to the shooting and tested positive for them in the emergency room did not alone establish that he was impaired therefrom or under their influence at the time the defendant shot him). Here, in reviewing the evidence relating to Victim's use of toluene, the trial court found that neither of the expert witnesses offered testimony sufficiently proving that Victim was under the influence of toluene *at the time of the incident*, which precluded O'Keefe from presenting evidence of Victim's inhalant use to the jury. We agree. In the offer of proof, forensic microbiologist S.M. testified about Victim's toxicology reports. S.M. testified that she tested Victim's blood and urine for toluene, a

21

substance found in glue, and got negative results. Because of the allegations of glue-sniffing in the case, S.M. sent Victim's blood and urine to NMS Labs, which also came back negative for toluene in Victim's bloodstream. The NMS Labs' report found a positive result in Victim's urine for o-Cresol, which is a metabolite, or byproduct, of toluene. S.M. testified that the toxicological results from NMS Labs were inconclusive in that they neither confirmed nor denied that Victim was under the influence of toluene *at the time and date of the incident.* S.M. explained that toluene is quickly metabolized in the blood and that the presence of an active drug in the blood is what permits an inference as to when and at what level a person was under the influence. S.M. opined that the presence of a metabolite of toluene in Victim's urine showed only that Victim used toluene at some point in the recent past, within "a couple of days" of the incident.

O'Keefe testified that before Victim exited his truck and spoke with slurred speech like he was intoxicated, Victim twice brake-checked him on the highway by pulling in front of him at high speeds and driving close without hitting him. Both S.M. and the Trooper testified in the offer of proof that Victim's conduct was inconsistent with being under the influence of toluene. The Trooper acknowledged hearing evidence from Victim's Mother, Girlfriend, and Son about Victim's glue-sniffing during the investigation, including that Son found one empty package of glue and three sealed packages of glue in Victim's truck. However, the Trooper testified that based on all the witness testimony, he found nothing indicating that Victim was under the influence of an inhalant *at the time of the incident.* Rather, based on his knowledge and experience as a DRE, the inhalant category involves a complete loss of motor control due to the lack of oxygen to the brain, such that evidence of Victim's highway driving would be inconsistent with someone under the influence of an inhalant. The Trooper also stated that from

22

the time Victim exited his vehicle, there was no sign of loss of motor control or any type of muscular issue. Similarly, in reaching her opinion that Victim's conduct was inconsistent with a person under the influence of toluene, S.M. testified that, based on her training and experience, a person under the influence of toluene is receiving less oxygen to the brain and cannot operate a motor vehicle. Instead, a person under the influence of toluene would only manage short drives in a confined area, such as driving into parked cars in a parking lot or rolling into a pond, and would be incapable of driving on a highway or exiting from and standing up beside a vehicle.

O'Keefe points to S.M.'s testimony that someone with a long history of inhalant abuse may not appear impaired or show symptoms of acute intoxication as evidence in support of Victim being under the influence at the time. However, it is just as plausible to interpret S.M.'s testimony as suggesting that, as an alleged chronic inhalant abuser, any effects on Victim from recent glue-sniffing would be de minimis and thus not relevant. The trial court reached the latter conclusion, and we are not persuaded that the trial court abused its discretion when reasonable minds could disagree. See Sinks, 652 S.W.3d at 346 (quoting Brandolese, 601 S.W.3d at 533).

Because O'Keefe's offer of proof did not sufficiently demonstrate that Victim was under the influence of toluene from glue-sniffing at the time of the incident, the evidence was not relevant to any material fact at issue in the case at trial. See Harris, 560 S.W.3d at 561–62; see also Blurton, 484 S.W.3d at 779. The proffered evidence of Victim's inhalant use was too tenuous to support a claim of trial court error even under the low bar for logical relevance, therefore we find the trial court did not abuse its discretion in excluding the evidence from trial. See Townsend, 649 S.W.3d at 77–78 (internal citation omitted). Points Four, Five, and Six are denied.

## III.  Point Seven—Plain Error in the State's Closing Argument

O'Keefe claims the trial court plainly erred in allowing the State to comment in closing argument that "you don't hear [O'Keefe's story] for a year after the fact" and that O'Keefe and Wife had "over a year to rehearse" his self-defense claim. In particular, O'Keefe argues the State committed a Doyle[4] violation during closing argument by saying that O'Keefe waited until trial before he ever asserted a claim of self-defense. In so commenting, O'Keefe maintains the State improperly referred to his constitutional right to remain silent.

A.     Standard of Review

Acknowledging that he did not object to the State's closing argument at trial, O'Keefe seeks discretionary plain-error review under Rule 30.20. As stated previously, we first determine "whether the claim of error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted." Minor, 648 S.W.3d at 731 (quoting Grado, 559 S.W.3d at 899). Second, if we find error that is "evident, obvious and clear," we then consider whether the claimed error resulted in manifest injustice. Id. (quoting Grado, 559 S.W.3d at 899–900).

Unpreserved errors in closing argument rarely rise to the level of reversible plain error. State v. Johnson, 599 S.W.3d 222, 227 (Mo. App. W.D. 2020) (quoting State v. Wood, 580 S.W.3d 566, 579 (Mo. banc 2019)). "It has long been held that '[p]lain error relief as to closing argument should rarely be granted and is generally denied without explanation.'" State v. Hall, 319 S.W.3d 519, 523 (Mo. App. S.D. 2010) (internal quotation omitted). "Courts especially hesitate to find plain error in the context of closing argument because the decision to object is often a matter of trial strategy, and in the absence of objection and request for relief, the trial court's options are narrowed to uninvited interference with summation and a corresponding

---

[4] Doyle v. Ohio, 426 U.S. 610 (1976).

increase of error by such intervention." State v. Reese, 632 S.W.3d 365, 378 (Mo. App. W.D. 2021) (quoting State v. Edwards, 116 S.W.3d 511, 536 (Mo. banc 2003)).

When reviewing an alleged Doyle violation for plain-error review, "the essential predicate . . . is to first determine that a Doyle violation occurred." State v. Seaton, 628 S.W.3d 424, 430 (Mo. App. W.D. 2021) (citing State v. Dexter, 954 S.W.2d 332, 340 (Mo. banc 1997)). Only if we find a Doyle violation occurred do we then evaluate its effect on the jury's verdict by considering the following four factors:

> (1) whether the [State] made repeated Doyle violations,
> (2) whether any curative effort was made by the trial court,
> (3) whether the defendant's exculpatory evidence is transparently frivolous, and
> (4) whether the other evidence of the defendant's guilt is otherwise overwhelming.

State v. Rice, 573 S.W.3d 53, 74 (Mo. banc 2019) (internal quotation omitted).

B.     Analysis

Missouri courts have held that "the use for impeachment purposes of a defendant's silence, ***at the time of arrest and after receiving Miranda[5] warnings***, is fundamentally unfair and violates the due process clause of the Fourteenth Amendment." Dexter, 954 S.W.2d at 337 (emphasis added) (quoting Doyle v. Ohio, 426 U.S. 610, 618–19 (1976)); see U.S. Const. amends. V, XIV. "This rule rests on 'the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial.'" Id. (quoting Wainwright v. Greenfield, 474 U.S. 284, 291 (1986)); see, e.g., State v. Billings, 522 S.W.3d 276, 282 (Mo. App. S.D. 2016) (finding the State committed Doyle violations by arguing that the defendant's invocation of his right to remain silent by refusing to answer the arresting officer's questions showed the defendant was guilty of the charged offense). The State may not induce a defendant's silence through a Miranda warning

---

[5] Miranda v. Arizona, 384 U.S. 436 (1966).

and then use that silence as evidence against the defendant at trial. State v. Santillan, 1 S.W.3d 572, 579 (Mo. App. E.D. 1999) (internal citation omitted).

In this case, O'Keefe surrendered himself to law enforcement while accompanied by his attorney. O'Keefe identifies no express invocation of his right to remain silent in the record nor any mention of a Miranda warning. In Santillan, we held that when a defendant's post-arrest silence is not based upon a Miranda warning, or by an express assertion of the right to remain silent, then his due process rights are not violated when he voluntarily takes the stand and subjects himself to cross-examination. Santillan, 1 S.W.3d at 579–80 (internal citation omitted). In Santillan, the alleged Doyle violations arose when the State cross-examined the defendant about why he did not tell his side of the story until six years after the murder. Id. Santillan determined no Doyle violation occurred because there was no showing that the defendant's silence raised in cross-examination was related to the defendant receiving a Miranda warning and because the State's questions were not confined to the defendant's post-arrest silence but also concerned inconsistencies in his story as told to others during the six years following the murder. See id. Similarly, here, the record does not support finding that the challenged statements in the State's closing argument improperly commented on any post-arrest silence invoked by O'Keefe pursuant to a Miranda warning, as no such invocation was made. See id.; Seaton, 628 S.W.3d at 430 (internal citation omitted).

Further, we must view the challenged statements in the context of the entire case. See Swalve, 598 S.W.3d at 689 (internal citation omitted). The statement that "you don't hear [O'Keefe's story] for a year after the fact" appeared in the context of contrasting how eyewitness passersby called 911 immediately whereas O'Keefe and his Family did not. The statement offered a rebuttal to O'Keefe's opening argument that the State would not be able to show a

26

consciousness of guilt because he surrendered himself to authorities within seventy-seven hours of the incident. See State v. Gott, 523 S.W.3d 572, 582 (Mo. App. S.D. 2017) (noting the State does not commit a Doyle violation by rebutting an argument to which the defendant opened the door). Because the statement commented on O'Keefe's *pre-arrest* silence, it did not demonstrate an unmistakable reference to his exercise of his right to remain silent incident to a Miranda warning or an arrest. See Santillan, 1 S.W.3d at 580. The other statement that O'Keefe and Wife had "over a year to rehearse" his self-defense claim for trial was not necessarily an improper comment on O'Keefe's right to remain silent, but instead could be construed as a permissible argument that O'Keefe's self-defense claim was "rehearsed" and consequently not credible. See id. Therefore, we are not persuaded either challenged statement constituted a Doyle violation that was "evident, obvious, and clear" requiring the trial court to interrupt the State's closing argument sua sponte. Minor, 648 S.W.3d. at 731 (quoting Grado, 559 S.W.3d at 899).

Because we find no Doyle violations in the limited statements made by the State in closing argument, we conclude the trial court did not plainly err. See Reese, 632 S.W.3d at 378 (quoting Edwards, 116 S.W.3d at 536). Point Seven is denied.

### Conclusion

The judgment of the trial court is affirmed.


_____
KURT S. ODENWALD, Presiding Judge


Michael E. Gardner, J., concurs.
Renée D. Hardin-Tammons, J., concurs.